[Crim. No. 3687.   Second Dist., Div. Three.   June 28, 1943.]

THE PEOPLE, Respondent, v. DELPHINE SLATTERY, Appellant.

Robert E. Ford for Appellant.

Robert W. Kenny, Attorney General, and Alberta Belford, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant Slattery and one Charles Peck were accused jointly, in two counts, of the crime of

forgery of fictitious name. In a trial without a jury they were convicted. Defendant Slattery was granted probation upon condition that she pay a fine of $200. She appeals from the order denying her motion for a new trial.

Appellant asserts that the evidence was insufficient to support the judgment because there was no evidence, other than the testimony of her co-defendant Peck, an admitted accomplice, that the checks were fictitious or that she knew they were fictitious.

On July 7, 1942, appellant, a guest registered as H. L. Hunt at the Beverly-Wilshire Hotel, made a purchase at the W. & J. Sloane Furniture Company and delivered to that company a check in the sum of $30 drawn on a bank in Fresno, dated July 7, 1942, payable to H. L. Hunt, and bearing the name Geo. McCormick as drawer. She wrote the name "H. L. Hunt" on the back of the check. The difference between the purchase price, approximately seven dollars, and the amount of the check was paid to her in cash by the furniture company.

On July 12, 1942, appellant delivered to the Beverly-Wilshire Hotel, in payment of her hotel bill of approximately $20, a check in the sum of $65, drawn on the same bank in Fresno, dated July 12, 1942, payable to H. L. Hunt, and bearing the same name as drawer. She wrote the name "H. L. Hunt" on the back of the check. The difference between the amounts of her bill and the check was paid to her in cash by the hotel.

There was no account in the Fresno bank in the name of Geo. McCormick, and there was no credit arrangement by which the bank would honor checks drawn under the name of Geo. McCormick. The checks were not paid by the bank and were returned to the payees. It was stipulated that "the bank manager's knowledge of the people in and surrounding Fresno County did not include a George McCormick." It was stipulated further that a handwriting expert would testify that the handwriting on the fronts of the two checks was identical with an exemplar of Peck's handwriting, and that Peck wrote the two checks. Peck had been convicted previously of grand theft as a result of borrowing money and giving as security therefor the furniture of appellant upon which there was a mortgage. Appellant was accused and tried jointly with him, but was acquitted.

Appellant told the assistant manager of the Beverly-Wilshire Hotel, when she delivered the check to him for approval

as she was checking out of the hotel about 8:30 p. m. on July 12, 1942, that she knew George McCormick, that she had had checks from him before and the check was "perfectly all right"; that she had to leave hurriedly because she had just received word that her father was very ill in Santa Monica and she was rushing there to be with him. When she made that statement she knew that her father had been dead two years.

A police officer testified that appellant told him, when Peck was not present, that Peck and a man whom he introduced to her as George McCormick, a millionaire, were in her hotel room betting on horse races, and Peck gave her the checks to cash. He testified further that Peck told him, in the presence of appellant, that Peck had written the checks at the suggestion of appellant; that she told him to make them in the name of H. L. Hunt and sign the name "George Mc-Cormick;" that she told Peck the checks were to be given to bookmakers; that appellant and Peck were the only ones present in her hotel room when Peck wrote the checks and gave them to her; that he (the officer) then asked her to tell what part she took in passing the checks, and she said she had never seen Peck write a check and that she had been advised by her counsel not to discuss anything.

When she was arrested on August 14, 1942, she was at the railroad station preparatory to leaving for the East. Approximately two weeks before the trial she repaid the money she received upon the checks.

Appellant testified in substance as follows: She used the name, Mrs. H. L. Hunt, at the hotel because she had been there under that name about twelve years ago when she was married to H. L. Hunt. At other places she was known under the names of Lovejoy, Smith, Davenport and Slattery. On July 7, 1942, she saw Peck in the hotel lobby with a man whom he introduced to her as George McCormick, a very wealthy man from San Francisco. Peck asked if she knew where they could get a bookmaker and, when she said she did not know, he asked if they could use the telephone in her room. She took them to her room, remained there about five minutes, and left them in her room while she went to a beauty parlor. She returned to her room within one-half hour and, as she entered her room, Peck had a check for $30 in his hand, told her they were going to play the races and asked if she would cash a check for McCormick at Sloane's when

she made a purchase there. McCormick apologized for being short of money, but said the check was all right, and then she went to Sloane's, made a purchase and cashed the check. She returned about 11 a. m. and handed the money to Mc-Cormick. She saw Peck and McCormick again on July 12, 1942, in the hotel lobby and she permitted them to use her telephone again, but she remained away from her room. When she returned to her room they said they had been playing the races and that McCormick had lost considerable money. Mc-Cormick asked her if she could get a check cashed for him and she took the check for $65, went to the lobby, did not cash the check, returned and handed $65 to him from her own money. She left them again in her room, went to the lobby again, and when she returned they had gone. She cashed the $65 check at the hotel about 8:30 o'clock that evening and then left the hotel. She registered as Delphine Slattery at an apartment house that night, and the next day she registered at the Miramar Hotel under the name of Davenport. She left the Beverly-Wilshire Hotel to get away from Peck who had been bothering her by asking her to "raise money for him." He had also "hounded" her for money when she was at the Huntington Hotel. She had tried to help him several times by raising money for him when he was in trouble. When she was living at the Beverly Hills Hotel (not Beverly-Wilshire) prior to cashing the two checks above mentioned, she cashed a check for $35 at that hotel on July 5, 1942, drawn on a bank at Santa Barbara, payable to "L. H. Hunt" (not H. L.) and signed "Albert Mc-Kay," which check Peck gave to her as her winnings from a bet on a horse race. The hotel owner did not notify her the check came back. The night she left the Beverly-Wilshire Hotel, after cashing the $65 check, she and Peck left in a taxicab, stopped in front of the Beverly Hills Hotel, and Peck went in and paid to the hotel the $35 which it had paid to appellant when she cashed the "Albert McKay" check. She became acquainted with Peck about two years previously when she obtained race information from him. She knew when she cashed the checks that he was a race track tout.

Peck testified in substance as follows: He had known appellant four years. On July 7, 1942, he was with her in her room at the Beverly-Wilshire Hotel and she had a book of blank checks from the Fresno bank. She said she wanted to go East to see her daughter who was about to give birth to a

child and that, although she could get the money for the trip by a loan on her furniture, she wanted Peck to write a check on the Fresno bank in order that she might show the out-of-town check to a bookmaker and thereby obtain credit to make a bet on the races. She said she would not cash the check. He wrote the check for $30 and left. He saw her again on July 12th at the hotel, although he had been trying to avoid her. After she asked him to write another check on the Fresno bank for $65 in the name of George McCormick in order that she might show it to a bookmaker, he wrote the $65 check and left. There was no George McCormick and he did not know anyone by that name. His (Peck's) only income was what his children gave him. He also wrote the check for $35, signed "Albert McKay," which she cashed at the Beverly Hills Hotel. She lived at 15 of the finest hotels and used different names at those places.

The testimony of Peck, the accomplice, shows that the checks were fictitious and that appellant knew they were fictitious. A conviction cannot be had, however, upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. (Pen. Code, sec. 1111.) ■ The evidence that there was no account in the bank in the name of Geo. McCormick and no arrangement for credit whereby the bank would honor checks drawn under that name was prima facie evidence that the name, Geo. McCormick, was fictitious. (People v. Eppinger, (1894) 105 Cal. 36, 41 [38 P. 538]; People v. Cohen, (1931) 113 Cal.App. 260, 262 [298 P. 114].) The handwriting expert said Peck wrote the checks. In addition to the prima facie evidence, and the handwriting expert's evidence, of the fictitious character of the checks, there were circumstances other than those included in the testimony of the accomplice which showed appellant's consciousness of guilt. The name of the payee, H. L. Hunt, was not the name she regarded as her true name. At the time she cashed the $65 check she left the hotel hurriedly and stated falsely that she was leaving hurriedly to be with her very sick father. Then she went directly to the Beverly Hills Hotel and repaid to that hotel money she had received from it one week previously upon the Santa Barbara bank check, given to her by Peck, and which check she said she did not know had been dishonored. That same night she registered at an apartment house under the name of Slattery, and the next day she

moved to another place and registered under the name of Davenport. She had several aliases.

There were further circumstances, other than those shown by Peck's testimony, from which the trial judge could draw inferences of appellant's culpability. She knew that Peck, who handed her the first check of the alleged McCormick with the request that she cash it at Sloane's, had no money, credit, or income, and was entirely unreliable financially, that he could not be relied upon for truth, that he was a race track tout all of the time she had known him, and a convicted felon as a result of obtaining money by false pretenses in a transaction in which she also was involved. He had always "hounded" her for money, and she had "raised" money for him several times when he was in trouble. She had known the alleged McCormick, who apologized for being short of money and who was then gambling in the races, only a few minutes before she accepted his check upon the recommendation of the unreliable Peck. She was anxious to obtain money in order to go East to see her daughter.

The evidence other than the testimony of the accomplice tended to connect the appellant with the commission of the offenses alleged, and included sufficient corroboration of the testimony of the accomplice that she knew the checks were fictitious. If the circumstances shown in evidence reasonably justify the finding of guilt by the trial court, a reviewing court is not warranted in disturbing the finding. *(People v. Newland,* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) The evidence was sufficient.

Appellant refers to a statement by the trial judge, made to Peck while Peck was testifying, as follows: "I haven't believed a word you have said today . . .," and asserts that such expression evinces a reasonable doubt as to the guilt of appellant. Preceding that statement the judge and witness had been discussing at some length (six or seven statements by each) what was said by another judge at the time he sentenced Peck on the grand theft conviction, and what the general behavior of Peck had been. The record as to what was said at the time of that sentence was before the trial judge in the present case. The following excerpt from the transcript herein shows the full statement that was made regarding disbelief and the statements immediately preceding and succeeding it. "The court: Then it did amount to something. Well, that has been your means of livelihood ever since you were born, trying to trick somebody. The witness:

Well, your Honor, I never tried to——. The court: Well, of course, I don't know. I haven't believed a single word you have said today, so don't tell what you have been trying to do. You are on probation now? The witness: Yes. The court: With a San Quentin sentence over your head? The witness: I know it; I know it. . . . Well, I didn't get any money. She admitted she didn't give me any money. She said she gave it to a man by the name of Mc-Cormick, and there was no such McCormick in existence. There was no such man in existence. She says she gave him the money, your Honor; she says she gave the money to him. Then she says I introduced the friend. I never introduced him to anybody. I told the truth. She made me write out the checks that she was going to show to the bookmaker.''

The statement that the judge did not believe a single word that Peck had said should not be adopted literally in view of the fact that some of Peck's statements were unquestionably true—for example, that he had been convicted of grand theft, was on probation, and he knew appellant. Furthermore, it appears from the above excerpt that, after said statement by the court had been made, Peck gave testimony implicating appellant. It may be that the court believed some of the testimony given by Peck after that statement by the court. It is to be noted, however, that thereafter the court said, concerning the testimony of both Peck and appellant, as follows: ''Well, each one of them has certainly been crossing the other. So I can't believe either one.'' The judgment of the trial court that appellant was guilty was in accord with its statement that it did not believe appellant, and that judgment was consistent with the statements of Peck implicating appellant. In view of the judgment as to appellant it may be the court changed its mind at least in some respects as to its belief in the statements of Peck, therefore it should not be concluded that the court did not believe some of Peck's testimony implicating appellant.

The case of *People* v. *Hidalgo*, (1933) 128 Cal. App. 703 [18 P.2d 391], cited by appellant, is distinguishable from the present case. In that case stolen blank checks bearing the printed name of a corporation were used in the alleged forgery. The corporation was a bona fide entity, but no qualified representative of the corporation testified as to who were authorized to sign as drawers of the checks, and it was not shown that the alleged forged checks were not drawn by

persons authorized to draw them. In the present case a prima facie case was established by showing there was no account in the bank in the name of Geo. McCormick, and there were other circumstances from which the fictitious character of the checks could be inferred.

The order denying the motion for a new trial is affirmed.

Desmond, P. J., and Shaw, J. pro tem., concurred.