[Crim. No. 5547. In Bank. Oct. 26, 1954.]

THE PEOPLE, Respondent, v. HENRY C. SIMPSON, Appellant.

Norman Leonard, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and Frederick G. Girard, Deputy Attorneys General, for Respondent.

CARTER, J.—Henry C. Simpson and Clarence Eugene Simpson were jointly charged by indictment with the murder of Vivian Simpson on or about March 10th, 1953. Clarence Simpson, being 13 years of age, was certified to the juvenile court and proceedings against him suspended. Defendant pleaded not guilty and not guilty by reason of insanity. After a jury trial, he was found guilty of murder in the first degree without recommendation; he was also found sane at the time the crime was committed. Defendant's motion for a new trial on both pleas was denied. The appeal is automatic (Pen. Code, § 1239, subd. b).

The theory of the prosecution, in essence, was that Henry Simpson counseled, advised, and encouraged (Pen. Code, § 31) his 13-year-old son, Clarence Simpson, to kill Vivian Simpson, the wife of Henry and mother of Clarence; that such crime was the result of premeditation and planning over a period of time on the part of Henry, Clarence, and a 14-year-old school friend of Clarence, one Jimmie Jones. Defendant and Clarence both deny the planning and premeditation, although Clarence admits aiming the gun at his mother and killing her with one shot through the chest. It is the main contention of the defendant that the testimony of Jimmie Jones, being an accomplice, is uncorroborated. Defendant denied that there was a plan made with Clarence and Jimmie to kill Vivian and claimed that Jimmie told him the gun went off when Clarence stumbled over a stake.

### BACKGROUND

Henry Simpson and Vivian Dodge met in 1937, or 1938, in Porterville, California, and shortly thereafter commenced living together. Both parties had been previously married and Vivian had an infant son, Donald Dodge, living with her. In 1939, Clarence was born and in 1942, the couple were married. Two other sons, Billy and Gary, were subsequently born to them. The Simpsons moved several times selling, at different times, grocery stores, an auto court, and a poultry ranch until 1952 when Henry traded a ranch near Escalon for a home at 1117 Herndon Road, in Stanislaus County.

The Simpsons lived in this home until March 10, 1953, the date of the murder of Vivian. During this period, defendant bought a lot north of the family home and remodeled and rebuilt a house there. He traded that house for another on Holm Avenue which he was engaged in repairing and remodeling. During the period of time the couple lived together, Vivian worked at different occupations—in an olive plant, canneries, grocery stores, and as a domestic helper for two different women after the couple moved to the Herndon Road property. The relationship between the couple was not harmonious and the evidence shows numerous quarrels and abuse on the part of both. Defendant testified that Vivian was "No good" and a "whore"; that she had sexual relations with other men; that she beat and threatened the children. At one time Vivian had defendant arrested for threatening her with a deadly weapon at which time she left him for several weeks; at another time, defendant commenced a divorce action against Vivian but subsequently dismissed it. At still another time, defendant had a warrant issued for Vivian's arrest because she had been beating the children; a witness testified, however, that the action was taken to "get even with her" for having had him arrested. About this time, defendant commenced another divorce action and the children were placed in the custody of the juvenile court. Both the criminal action and the divorce suit against Vivian were dismissed and the children were returned to the couple who started living together again.

Such was the background to the events which culminated in the shooting of Vivian on March 10, 1953.

### TESTIMONY OF JIMMIE JONES

Jimmie Jones testified that on Friday afternoon, March 6, 1953, he, defendant, and Clarence were at the Holm Avenue house which defendant was engaged in remodeling. Jimmie testified that defendant told him he wanted him, Jimmie, to be a witness for him and Clarence—that they were going to kill Vivian. According to Jimmie's story, it was first suggested that Clarence use a baseball bat to kill his mother and then put a knife in her hand to make it look like self-defense. This plan was rejected by the boys. It was then suggested that a fishing trip be planned for a week from the following Saturday; that the boys bring a rifle into the house, pretend to be cleaning it, and that Clarence would "accidentally" shoot his mother. Jimmie testified that he spent most

of the following day, Saturday, with Clarence and defendant, and that defendant again brought up and discussed the plan for killing Vivian. On Monday, March 9, Jimmie again spent most of the day at the Simpson home and defendant again reiterated the plan to kill Mrs. Simpson. The witness also testified that defendant told them repeatedly that they would have to kill Vivian, or she would put them in jail, or "get them." (The jail threat was based on an accusation allegedly made by Mrs. Simpson that he and Clarence had stolen a watch and some money from the Curtis home where she worked when they had been there waiting to take her home in the car driven by defendant.) Jimmie testified that defendant had told them that if they committed the killing nothing would happen to them, but "to leave him out of it so he could get us a lawyer and after it was over he would get us a car and a gun and we would go on a trip that summer and have a lot of fun and everything"; for them to stick to their story (of an accidental shooting) and that "after it was over and we stuck to our story and everything came out all right, he would get us a car, a gun, and going to take us on a trip that summer, back to Arizona and Nevada, or some place back there. . . . We were going to have a lot of fun fishing and stuff, and catch horses. . . . Yes, wild horses, and bring them out here." He also testified ". . . he told us when we went on a fishing trip, to bring the gun in the living room and kind of wrastle around over it and we would accidentally shoot Mrs. Simpson. That was to be done on the following Saturday."

Jimmie testified that on Monday, March 9, he and Clarence, at defendant's bidding, took the gun out of the house and across the alley and put it in between the rafters and wall of a house which was being built by a man by the name of "Bill" (later identified as one Bill Christian) to hide it; that later that night he and Clarence got the gun from its hiding place and put it in defendant's truck.

Concerning the day of the murder, Jimmie testified that after school, about 4 o'clock, he and Clarence went to the Simpson home and did the chores; that they went to the Holm Avenue house where defendant was working and that defendant again repeated the plan to them. After supper, the boys rode their bicycles to Roy Lutz' house to see if Mrs. Simpson was there; that after returning from there they "went in the house and went in and laid down on the boys' bed and were reading books of some sort when the smallest boy, Gary, came

in and told Clarence and I that Mrs. Simpson had a box of important papers that belonged to Mr. Simpson, or something, and Clarence walked over to her bedroom and pulled the curtains back and asked her what she was doing with it. She said that she was just looking them over, that they belonged to both her and Mr. Simpson, that both of them had a right to look at them; that Clarence wasn't the boss of her.

"Then she went out of the living room and Clarence—or Gary went in and got the box and brought it in to me where there was a broken window in the bedroom. I gave it to Clarence outside of the window and he put it under an old screen or something outside the house. Then we went back to the house, sat down on the lounge." Jimmie testified then that Mr. and Mrs. Simpson began arguing about their property, or deeds, and finally when defendant went outside and the small boy, Gary started to follow him, that Mrs. Simpson followed the defendant and Gary outside; that Clarence and he also went out to the carport. He stated that "Just before Mr. Simpson started to go out he called Clarence and I out and told us we would have to do it that night. He didn't give us any reason except she was going to get us if we didn't get her, we would have to do it that night. Then he took the two boys and went down to the neighbors. . . .

"He went to the neighbor's. They were neighbors by the name of Bill—Bill Parker, I think, something like that . . . Clarence and I followed him down. When we got there Clarence said something about, 'Do we have to do it now.' or something. Mr. Simpson was talking to Bill, we couldn't hear the conversation. . . . I don't remember the exact words he said. All I heard was 'do it now.' And Mr. Simpson, when he was through talking to Bill—well, went back up to the house, then he went in. We followed him in. Then they started—then the quarrel started over Gary. . . . Then after they were out on the porch, Clarence and I followed them out. . . . Mr. Simpson started to go outside; Gary went to follow him. Mrs. Simpson picked him, said he could stay with her, and Mr. Simpson said if he wanted to go with him, if Gary wanted to go with him, to let him come. Then Mrs. Simpson said 'No, he could stay with me.' Then Gary got away from Mrs. Simpson, was crying to go with Mr. Simpson, so I took him out in the kitchen to get a drink. Mr. Simpson went outside, Gary followed him out. Mrs. Simpson went out to get Gary and she took ahold of one arm of Gary and Mr. Simpson had the other; they were having a tug of war over Gary. I looked

at Clarence, he started running towards the truck so I turned and followed him. He opened the door and started to get the gun out. It was ... just the hand [le] of it was sticking out, and he said he couldn't get it. I took ahold of it, it came right out, so I took ahold of the cloth and he took the gun and run up the pathway. . . . There was a cloth wrapped around the gun. Then he run by the pathway there right alongside the clothesline and I went over by the ashcans. Mrs. Simpson turned, walked over to the west edge of the carport . . . looked around. I looked over at Clarence just in time to see him raise the gun and fire. . . . Well, I seen him raise it to his shoulder and aim and he fired. Mrs. Simpson turned a little bit and hollered, 'Hank, I'm hit, I'm going to die.' Went over to the east edge of the carport and fell down. Clarence and I run up there. Clarence tossed the gun up against the house and Mr. Simpson came over and bent down over Mrs. Simpson to feel of her face or something. When he stood up, Clarence said, 'Is she dead? Did it work?' He said, 'I'm afraid so, son, I'm afraid so.' . . . Then Mr. Simpson says, 'You tripped over that stake there, didn't you Clarence?' He said, 'Yes.' He said, 'Well, stick to that,' he said. 'Did you eject the cartridge?' Clarence said, 'Yes.' He said, 'What did you do that for?' He said, 'I don't know.' Mr. Simpson said, 'Oh, well, it's all right now,' he said, 'you stick to the story. They can't do anything to you. Be sure to put on a good sob story, and leave me out of it.' Then he went over to the neighbor's. While he was gone Clarence and I went out, walked around looking for the shell. We couldn't find it, so we went over and told . . . I told Clarence if we were going to stick to that story, he had to put his foot up against the horseshoe peg. After we got through doing that we came back. The neighbor came back with Mr. Simpson. . . ." He also testified that after the officers had questioned them, Mr. Simpson told them that they were to stick to their story, that they were all in it together, "that if one of us said anything, we were just wringing our own neck. So he said stick to that story, they couldn't prove anything." On vigorous cross-examination, he testified to substantially the same conversations having taken place.

### Clarence's Testimony

Clarence Simpson, defendant's son, testified in substantially the same vein as Jimmie Jones up until the point where he is supposed to have asked if he was "to do it now." His testimony at the trial was that Jimmie said to him "We better

go get the gun''; that he couldn't get it out of the truck, but Jimmie did and handed it to him saying ''Go ahead and use it''; that he then walked a ways and shot his mother because ''she was going to get rid of my little brother and Jimmie told me to; I lost my head.'' Clarence then testified that Jimmie told him that ''you better say you stumbled over the stake.'' Clarence, while admitting association with Jimmie and his father at the times testified to by Jimmie, denied that there had been any plan of any kind made to kill his mother. He admitted taking the gun and hiding it in the half finished house belonging to a neighbor. He testified that he told Jimmie that he didn't think the officers would believe the story they had told and that Jimmie said, ''Well, we better tell that your Dad put us up to it, we had this all planned up, that we was going to go fishing on Sunday and on Saturday we was going to hold the gun and fool around with the gun in the house and make it look like an accident, then we could say that my Dad just put it off and told us to do it that night.''

A statement made by Clarence on March 12, 1953, in the district attorney's office was admitted for the purpose of impeaching testimony given by him at the trial. In that statement, Clarence said that he and his father had been planning the ''accident'' for two weeks; that his dad had wanted the boys to do it and that he, defendant, did not want to be around when it was done. He also stated that on Tuesday night, the defendant had said that maybe they ought to ''do it tonight, get it over with.'' In his statement, Clarence said that his mother was going to kill him and that he shot her in self-defense and also that he had shot her accidentally because he had stumbled; that it was not self-defense and that he had not stumbled. He also stated that for over a month his father had been telling him that his mother would have to be killed before she killed Clarence; that the plans were all made, but that he wasn't going to go through with it.

### DEFENDANT'S TESTIMONY

Defendant denied having made any plans with either his son or Jimmie Jones. Concerning the occurrences on the night of the killing, he testified that his wife was having an argument with Jimmie when he came home and that the argument then turned into abuse of him, the defendant; that he went to Mr. Parker's home and tried to get him to go home with him; that Clarence and Jimmie came running after him; that Jimmie said Mrs. Simpson was after him with a gun. He then testified that he and the two boys went back to the

Simpson home where an argument started over Gary; that it was dark; that he heard a shot and his wife say "O, my God, I'm dying"; that he couldn't see; that he didn't know of his own knowledge who fired the shot; that Jimmie Jones told him that "the gun went off accidental, Clarence stumbled over that horseshoe peg"; that he then ran over to the neighbors (Bishop) and told them to get a doctor for his wife. He testified that after the officers whom Bishop had called left, he went to Mr. Johnson's (brother-in-law of defendant) home.

### OTHER TESTIMONY

Officer McDaniels testified that on the night of March. 10, 1953, he went to the Simpson home where he found the lifeless body of Vivian Simpson. He testified that Clarence told him that he had tripped over a peg and discharged the rifle; that defendant had told him either that the boy tripped over the stake or that the boy had told him (Simpson) that he had tripped.

Johnson, brother of the deceased Vivian Simpson, testified that on the night of the killing, defendant came to his home and said he had some "sad news"; that "Sonny shot Vivian while he was cleaning the gun to go fishing"; that she was "pretty bad hurt" but professed not to know what hospital she was in; that the man with defendant (identified later as Mr. Bishop) told him she was in a funeral parlor.

On the morning after the murder, a Mrs. Myrtle Coldwell called at the Simpson home to offer to take care of the children. She testified that the defendant told her that he didn't know why the boys had to go out and get the gun when he wasn't there; that his wife had been standing at the sink while the boys were in the room cleaning the gun behind her when it went off.

### CORROBORATION OF JIMMIE JONES' TESTIMONY

Defendant contends that the testimony given by Jimmie Jones is inherently improbable and that it was not corroborated by other evidence tending to connect the defendant with the crime. (Pen. Code, § 1111.)

██ In answer to defendant's contention that Jimmie Jones' testimony was inherently improbable, the rule is well settled that to warrant the rejection of the statements given by a witness who has been believed by a jury, or trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758]), and it is the exclusive province of the

trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends (*Hicks* v. *Ocean Shore Railroad, Inc.*, 18 Cal.2d 773, 781 [117 P.2d 850]). ■ Although the facts disclosed by the testimony given by Jimmie certainly disclose "unusual circumstances" (*Kidroski* v. *Anderson*, 39 Cal.App.2d 602, 605 [103 P.2d 1000]), it cannot be said that it was a physical impossibility for such facts to be true.

■ Section 1111 of the Penal Code does not require that an accomplice be corroborated as to every fact to which he testified but only that the corroborative evidence tend to connect defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth (*People* v. *Barclay*, 40 Cal.2d 146, 156 [252 P.2d 321] ; *People* v. *Santo, ante*, pp. 319, 327 [273 P.2d 249] ; *People* v. *Wayne*, 41 Cal.2d 814, 822 [264 P.2d 547]).

■ Proof of the elements of the crime, as contrasted with proof of the connection of defendant with the commission thereof, may rest upon the uncorroborated testimony of an accomplice (*People* v. *Harper*, 25 Cal.2d 862, 876, 877 [156 P.2d 249] ; *People* v. *Barclay, supra*).

Mrs. Mary Christian, a neighbor of the Simpson family, testified that about a year prior to the murder, she, her husband, and Mr. Simpson had taken a trip to Atwater in the Christian car; that on that trip, defendant showed her a gun he was carrying and said that he would have to get rid of his wife and that "It's going to be an accident." Mrs. Christian testified that on Monday evening, March 9, the defendant told her that "Clarence would have to kill her [Vivian] because she was not supposed to live any more, he couldn't get along with her"; and that he told her if "you hear 'Pop,' you don't know nothing about it."

Bill Christian, husband of Mary, confirmed his wife's testimony concerning the Atwater trip and testified that defendant said then that his wife had to be killed and that Clarence would kill her. He also testified concerning the hiding of the gun in the house he was rebuilding and stated that when Clarence, Jimmie, and the defendant came back to where the gun was hidden, defendant said to him "Bill, we're going to have to kill that woman," and "Clarence is going to have to kill her."

Donald Dodge, the 16-year-old son of the deceased woman, testified concerning the quarrels between defendant and his wife and also concerning various threats made by defendant

to deceased. He stated that defendant had told Vivian, sometime prior to the killing, that he was going to drop the tailgate off the cattle truck on her and make it look like an accident; that defendant said to Vivian ''I'm going to kill you and make it look like an accident. I'll have Clarence do it.''

■ False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence (*People* v. *Taylor*, 70 Cal.App. 239, 244 [232 P. 998] ; *People* v. *Santo, ante,* pp. 319, 327 [273 P.2d 249]). Defendant made various contradictory statements: that Clarence had stumbled over a stake and accidentally shot his mother; that he didn't know which one of the boys shot the gun; that Clarence shot his mother accidentally while cleaning the gun preparatory to going on a fishing trip. Mrs. Coldwell testified that defendant told her that Mrs. Simpson had been standing at the sink, with her back to the boys, and that the gun went off accidentally while it was being cleaned.

■ The evidence just set forth is sufficient to connect the defendant with the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. It is not necessary that the accomplice be corroborated as to every fact to which he testified. (*People* v. *Barclay, supra.*)

■ Briefly summarized, the corroborative evidence considered together with the facts heretofore set forth, shows that during the marital life of the parties, defendant had abused his wife, had threatened to kill her, and, for more than a year prior to the killing, had planned to have Clarence commit the crime and make it look like an accident. For this reason, the cases of *People* v. *Petree,* 109 Cal.App.2d 184 [240 P.2d 327], (see *People* v. *Jordan,* 115 Cal.App.2d 452 [252 P.2d 328]) and *People* v. *Lima,* 25 Cal.2d 573 [154 P.2d 698], relied upon by defendant, are not in point. Defendant relies upon the rule set forth in those cases that if the corroborative evidence raises only a suspicion of guilt it is not sufficient under section 1111 of the Penal Code. The rule as stated by defendant is correct, but the corroborative evidence heretofore set forth does more than raise a suspicion of guilt on the part of defendant and is ample to connect him with the crime and satisfy the jury that the accomplice told the truth.

### INSTRUCTION ON REASONABLE DOUBT

It is contended by defendant that the following instruction, given at the request of the People, had the effect of placing upon defendant the burden of proving his innocence and re-

moving from the People the burden of proving his guilt, and that he has been prejudiced thereby.

"In a criminal case, the jury should not find the defendant guilty of any offense unless his guilt is established by the evidence to a moral certainty and beyond all reasonable doubt, and the burden is on the prosecution to establish such guilt.

"The law presumes every man innocent until his guilt is established to a moral certainty and beyond all reasonable doubt, and this presumption attaches at every stage of the case, and to every fact essential to a conviction.

"Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs and depending on moral evidence, is open to some possible or imaginary doubt.' It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

"While presumptions of law, independent of evidence, are in favor of innocence, and every man is presumed to be innocent until proven guilty, yet if the evidence establishes the truth of the charge to a reasonable moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are to act conscientiously upon it, it is your duty to find the defendant guilty. The law does not require demonstration or that degree of proof which excludes all possibility of error and produces absolute certainty. Such proof is rarely available. Moral certainty only is required or that degree of proof which produces conviction in an unprejudiced mind.

"The term 'reasonable doubt,' as used in these instructions, means a doubt which has *some good reason** for its existence *arising out of evidence in the case** ; such doubt as you are able to find a *reason for in the evidence.** As applied to the evidence in criminal cases, it means an *actual and substantial doubt growing out of the unsatisfactory nature of the evidence** in the case. It does not mean a doubt which arises from some mere whim or vagary or from any groundless surmise, suspicion or guess."

 While the court was not restricted to the reading of section 1096 of the Penal Code defining reasonable doubt (see *People* v. *Derenzo,* 46 Cal.App.2d 411, 416 [115 P.2d 858];

---

*The emphasized portions are those concerning which complaint is made.

*People* v. *Eggers*, 30 Cal.2d 676, 688 [185 P.2d 1]; *People* v. *Castro*, 68 Cal.App.2d 491, 496-500 [157 P.2d 25]), it would perhaps have been better practice to have done so. ▮ The last paragraph of the instruction here complained of was not necessary to the definition of reasonable doubt, and, in the absence of the previous portion of the instruction, could have been confusing to the jury. The reasonable doubt prescribed by statute may well grow out of the lack of evidence in the case as well as the evidence adduced. We do not feel, however, that under the circumstances here prevailing the jury could have been confused, or the defendant prejudiced, by the emphasized portions of the instruction.

### PREJUDICIAL MISCONDUCT OF DISTRICT ATTORNEY

It appears from the record that defendant consulted Mr. Pierson, the deputy district attorney who prosecuted the case for the People, on June 14, 1952, relative to a divorce from his wife, Vivian. The divorce action was never tried since the couple were reconciled in October. Prior to the reconciliation, in August, defendant secured another attorney to represent him.

It is contended by defendant that from the prior representation, Mr. Pierson gained superior knowledge of his affairs with his wife, Vivian, and that the prejudice resulting to him from this superior knowledge was demonstrated during Mr. Pierson's cross-examination. Defendant cites several examples of this cross-examination but does not show how it could have resulted to his prejudice. ▮ An illustration concerns certain letters defendant introduced in evidence. These letters were four of apparently a number of letters written to him by Vivian at one time when she had left him and were introduced to show that she was reconciled with him and that they could live together harmonously. Mr. Pierson asked defendant why he had kept only four of the letters and defendant contends that the question implied that Mr. Pierson knew of other letters of a different tenor. In answer to Pierson's question, the defendant replied that Pierson had advised him that the four were all that would be needed for evidence. It is contended that this answer "reinforced" the unfavorable inference. In support of his position that the district attorney occupied inconsistent positions, defendant relies upon *Valentine* v. *Stewart*, 15 Cal. 387, *Wutchumna Water Co.* v. *Bailey*, 216 Cal. 564 [15 P.2d 505], and *Pennix* v. *Winton*, 61 Cal.App. 2d 761 [143 P.2d 940, 145 P.2d 561]. In the Valentine case, the attorney had represented the government in a land claim

contest. The court held that he could not, afterward, render any assistance to those seeking to *maintain* the land claim. In the Wutchumna Water case, (page 574) the attorney had for a great many years represented one party in a controversy and subsequently appeared as counsel for the other party in civil litigation. The court enjoined him from so acting, holding that he would be appearing practically on the opposite side of a controversy in which he formerly represented the appellant and also that he could not but use confidential knowledge and information gained by virtue of that former relationship. In the Pennix case, an action for personal injuries was involved. The defendant's attorney showed that he had formed an intent to act solely in the interest of defendant's insurance carrier even to the extent of accusing defendant (his client) and plaintiff of being in collusion with the intent to defraud the insurance company. It was held that prejudicial error had occurred and the case was reversed. In *People* v. *Spencer,* 61 Cal. 128, the attorney who drew the indictment for the criminal charge, represented the defendant at the trial. The court held that there could not be such an assumption of inconsistent positions.

It would appear that the cases cited by defendant are not similar to the situation under consideration. Here, Mr. Pierson had represented defendant briefly in a divorce action which did not come to trial but was dismissed, and defendant had procured other counsel for another divorce action prior to the time at hand; that action, too, was dismissed. It should also be noted that no objection was made by defense counsel at the time the matter was made known in the trial of the case at bar. Neither was objection made at that time that it was Mr. Pierson's "superior knowledge" that prompted him to question defendant concerning the other letters which had not been introduced in evidence by the defendant.

It is also argued that on another occasion, Mr. Pierson challenged the veracity of the defendant and stated that "If he [defendant] keeps it up, I'm going to have to take the stand." The transcript shows that during Mr. Pierson's cross-examination of defendant concerning the size of a book with which defendant stated his wife had struck Clarence, defendant would only gesture and would refuse to give an answer stating that "You [Mr. Pierson] have seen it." Mr. Pierson, during a heated exchange between himself, defense counsel, and the court, stated: "In these answers Mr. Simpson is giving, I don't know whether he wants me to take the stand and answer these statements he is making about me or not.

If he keeps it up, I'm going to have to take the stand.'' It does not appear that the deputy district attorney was questioning the veracity of the witness, but that he was endeavoring to make a point for the record; that defendant did not understand what was expected of him; that Mr. Pierson meant that he would have to take the stand to testify as to the size of the book.

Another alleged prejudice suffered by defendant occurred when Pierson attempted to recall to defendant's son Billy's mind whether he had ever heard his father say anything ''bad'' about his mother. During the recross-examination, Mr. Pierson asked Billy if he remembered being around when his father talked to him (Pierson) and Billy replied that he did not—that he only remembered going to Mr. Pierson's office once.

Defendant's argument that the deputy district attorney stated to the jury that he had ''checked'' on defendant's story and that he, Mr. Pierson, had not been ''mesmerized'' by defendant, is not borne out by the record. It is apparent that it was defendant who had done the ''checking'' and that the statement concerning ''mesmerized'' was a quotation from defense counsel's argument to the jury: '' 'Do you think,' says Mr. Friedman, 'that he mesmerized Mr. Pierson?' '' There was no assignment of prejudicial misconduct by defense counsel and, furthermore, it is difficult to see how such remarks could have prejudiced the defendant.

Still another contention that the district attorney was guilty of prejudicial misconduct is the allegation that ''two pages of the transcript'' were used in arguing to the jury facts not in evidence. In particular, complaint is made concerning the statement ''She's going to kill your little brothers'' in that there was no such testimony concerning the child Gary. Jimmie Jones testified that defendant told him and Clarence, on several occasions, that ''if we didn't get her she was going to get us''; defendant himself told one Eldon Marxmiller, a witness for the People, that ''I am going to get rid of her or she is going to get rid of me and the boys''; Clarence testified that one of the reasons why he shot his mother was because ''she was going to get rid of my little brother.'' It would appear that the evidence justifiably permitted the inference that the use of the word ''boys'' meant all of them, including Gary.

Another allegation of prejudicial misconduct on the part of the district attorney was the following portion of his

argument to the jury: (Mr. Pierson allegedly quoting a conversation by Mr. Simpson to Clarence.) "Now, Clarence, you watch those papers, you see she doesn't get away with any of those papers. She's trying to get this house. She'll get those papers away, then we'll be put out, we won't have any house to go to and won't have any place to go to. We'll be out in the cold. She's trying to get you away too, in this divorce action. If we don't be careful about this, she's going to get you boys away. She'll take you away and you won't have any father any more, you won't have any house, because she's going to take it away. Not only that, she just wants to take it away. She really just wants Gary because she wants to use him for the alimony she's going to get; don't really want him. She's going to do away with you boys as soon as she gets this divorce action." [Assignment of prejudicial misconduct by Mr. Friedman, defense counsel.]

"THE COURT: I think, Mr. Pierson, you were perhaps putting in an inference there. I'm quite sure that everything you said, Mr. Simpson didn't say to the little boys, it isn't in evidence.

"MR. PIERSON: I'll withdraw my statement then, Your Honor, if there is any question about that, I'll withdraw it and ask that the jury disregard my remarks, because I certainly don't want to put anything into evidence that isn't there."

The court thereupon admonished the jury to disregard the statement made by Mr. Pierson, and a general instruction to the same effect was also given.

There is no direct testimony in the record concerning the statement attributed to Mr. Simpson by the prosecution. There is, however, testimony by Clarence that he asked his mother what she was doing with the box of family papers; that later he and Jimmie Jones smuggled the box out of the house; that he later told his father his mother had been going through the papers and had taken a deed, or paper, out of the box; that he was afraid his mother would take some of the papers and that his father had previously told him that she had taken some and hidden them. Donald Dodge testified that defendant and Vivian often quarreled about the custody of the children upon separation; that Vivian wanted Gary but that defendant did not agree; that the couple argued over the home property. Other evidence previously recited shows that defendant, on several occasions, pointed out to Clarence that if he didn't get his mother she would get him. We said

in *People* v. *Eggers*, 30 Cal.2d 676, 693 [185 P.2d 1], that "In the argument before the jury, any reasonable inference may be drawn from the evidence, and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range of discussion. (*People* v. *Hoyt*, 20 Cal.2d 306, 318 [125 P.2d 29].)" The trial court here did not consider that "everything" Mr. Pierson said was permissible discussion and the jury was admonished, promptly, to disregard it. Under these circumstances it does not amount to misconduct which has prejudiced defendant's rights.

 It is also argued that the deputy district attorney, in his argument, referred to statements admitted solely for impeachment purposes as affirmative evidence in the case. This contention is not supported by the record which shows that the impeachment evidence was contrasted to the testimony given by the witnesses when on the stand. Furthermore, there was no assignment of prejudicial misconduct at the time. References to the "malevolent power" of Mr. Simpson over Clarence which forced Clarence to "parrot the fanciful stories that Mr. Simpson had planted in his mind" were not objected to at the time they were made and no showing is now made that defendant could have been prejudiced thereby.

 It is contended that a statement by the deputy district attorney that when Mr. Walters first heard about the death of Mrs. Simpson, he went to the sheriff's office to inform them, was a misstatement of the evidence. Mr. Friedman stated that Mr. Walters' testimony was that he had been sent for by the sheriff. Mr. Pierson replied that he did not recall the exact testimony and upon the court's question "Did he want to argue about it?" Mr. Pierson replied "I know the facts on it but I don't recall what the testimony was." The court then asked if he wished to concede the point and let it go, to which Pierson replied that he would not make an issue of the question. There was no assignment of prejudicial misconduct and no showing of prejudice since this particular matter was quite immaterial concerning the guilt or innocence of the defendant. The cases cited by defendant (*People* v. *Kirkes*, 39 Cal.2d 719, 724 [249 P.2d 1]; *People* v. *Evans*, 39 Cal.2d 242 [246 P.2d 636]; *People* v. *Brophy*, 122 Cal.App.2d 638, 651 [265 P.2d 593]; *People* v. *Ford*, 89 Cal.App.2d 467, 470 [200 P.2d 867]; *People* v. *Cook*, 148 Cal. 334 [83 P. 34]) are not in point. In the Kirkes case, the district attorney stated that he knew the defendant was guilty; in the Evans case, reference was made to a knife carried by the child's at-

tacker as being the same type of knife as that found in the defendant's possession. The child had been unable to describe the knife in her attacker's possession and that found in the defendant's possession was never introduced in evidence; in the Brophy case, reference was made to a bullet which was not in evidence and it was argued that a bullet which was then shown to the jury was the missing bullet and that the defendant knew that it was. In *People* v. *Ford, supra,* 89 Cal. App.2d 467, the prosecution's argument informed the jury that the defendant's coworker and acquaintance, had been convicted of the crime of theft of jewelry which had been found in his hotel room. The facts had shown that defendant and three coworkers had been employed by a furniture moving company to move household furniture from the home of the complaining witness. The jewelry in question had been kept in a dresser in that home. Upon the statement by the prosecution, the court admonished the district attorney that these facts concerning the coworker were not in evidence, but the attorney persisted and disputed the correctness of the court's ruling. In addition, an erroneous instruction was considered ground for reversal.

In *People* v. *Cook, supra,* 148 Cal. 334, the prosecution argued to the jury that the defendant had sent one man to prison because he was engaged to his daughter and the defendant was therefore jealous and capable of killing upon the same incitement. There was no evidence of any kind pertaining to the alleged statement; the court refused to so instruct the jury and the appellate court reversed.

In all of the cases relied upon by defendant, the damaging nature of the arguments is at once apparent.

Defendant's last contention is that the evidence does not justify the verdict. It is defendant's argument that since he did not fire the fatal, or any, shot and yet received the death penalty, the record should be scrutinized by this court with even greater care. Viewing the evidence most favorably in support of the judgment as we are bound to do, we feel that there is no merit to defendant's contention.

The judgment and order denying a new trial are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied November 24, 1954.