[Crim. No. 415. Fifth Dist. Dec. 21, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE
BLACKWELL, Defendant and Appellant.

Lloyd H. Riley, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, George Blackwell, a Negro laborer who was not without previous criminal experience, was accused in the information of carrying on a kind of concentrated economic warfare against grocery stores in and about Yuba City. He was charged with one count of conspiracy to commit forgery and 12 counts of forgery between September 24 and October 2, 1966; originally, there were also four prior felony convictions alleged in addition; the second and fourth prior convictions were dismissed before trial upon motion of the district attorney leaving the first prior conviction and the third prior conviction alleging robbery and petty theft with prior conviction, respectively, in the years 1952 and 1957, with each resulting in a term of imprisonment in the Arizona state prison at Florence, Arizona, as to which pleas of guilty were entered.

The first count in the information charged Blackwell with violation of section 182 of the Penal Code in that he and one Edward Williams ''and other persons whose true names are to the district attorney unknown did conspire, combine, confederate and agree together that the said George Blackwell should commit the crime of forgery, a felony''; a first overt act was alleged to have been the commission of forgery on September 24, 1966.

The crimes charged in the second to the 13th counts, all accusing the defendant of forgery were as follows:

| No. of Count | Date of Alleged Crime (1966) | Amount of Check | Persons Defrauded |
|---|---|---|---|
| 2d | Sept. 24 | $ 40.00 | Warren's Market, Wells Fargo Bank and Little Jack Nichols. |
| 3d | Sept. 25 | 32.00 | Sutter Super Market, James Herbert, Little Jack Nichols and Wells Fargo Bank. |
| 4th | Sept. 25 | 35.00 | Sutter Super Market, James Herbert, Little Jack Nichols and Wells Fargo Bank. |
| 5th | Sept. 28 | 50.00 | Wentz Market, Little Jack Nichols and Wells Fargo Bank. |

| No. of Count | Date of Alleged Crime (1966) | Amount of Check | Persons Defrauded |
|---|---|---|---|
| 6th | Sept. 28 | 60.30 | Wentz Market, Little Jack Nichols, James Herbert and Wells Fargo Bank. |
| 7th | Sept. 29 | 75.30 | Sutter Super Market, Wells Fargo Bank and Little Jack Nichols. |
| 8th | Sept. 30 | 75.22 | Safeway Market, Little Jack Nichols and Wells Fargo Bank. |
| 9th | Oct. 1 | 75.00 | Plumas Food Market, Wells Fargo Bank and Little Jack Nichols. |
| 10th | Oct. 1 | 75.00 | Wentz Market, Wells Fargo Bank and Jack Nichols |
| 11th | Oct. 2 | 40.00 | Warren's Market, Little Jack Nichols and Wells Fargo Bank. |
| 12th | Oct. 2 | 40.50 | Warren's Market, Little Jack Nichols and Wells Fargo Bank. |
| 13th | Oct. 2 | 40.00 | Warren's Market, Little Jack Nichols and Wells Fargo Bank. |

All the checks were personalized checks of Little Jack Nichols, who had his name printed on them, excepting only the check used in connection with the 10th count; and in that instance the forged name was that of Jack Nichols. Evidence given by Mr. Nichols shows that shortly before the commission of the first forgery, 200 of his blank personalized checks, numbered from 300 to 500, were stolen from his parked automobile. In most instances, the purported signature of Mr. Nichols was forged on the check, and the record is unquestioned that Mr. Nichols never authorized anyone to sign his name. On some of the forged checks, other names were used. All of the checks were unpaid as forgeries by the Wells Fargo Bank upon which they were drawn. Thus, the *corpus delicti* of each of the alleged crimes was proven without any contrary evidence.

Edward Williams, whose name, besides that of the defendant, was specified in the first count of the information, turned state's evidence and in his specific testimony admitted that he had conspired with Blackwell to commit forgery. Williams, of course, was an accomplice, and it became necessary for the district attorney to adduce corroborating evidence in support of the various accusations of crime.

 It was not necessary to corroborate the fact that crimes were committed in connection with the whole series of accusations from count 1 to count 13. The proof of the *corpus delicti* is ample in the accomplice's testimony as well as by other evidence, and it does not require corroboration. (*People* v. *Simpson*, 43 Cal.2d 553, 563 [275 P.2d 31].) But the evidence of the accomplice connecting the defendant with the crimes must be corroborated. Penal Code, section 1111 is as follows: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (See also *People* v. *Warren*, 16 Cal.2d 103, 116 [104 P.2d 1024]; *People* v. *Bevins*, 54 Cal.2d 71, 76 [4 Cal.Rptr. 504, 351 P.2d 776].)

The general rules defining the requisite nature of the corroborating evidence are well set forth in 19 California Jurisprudence, Second Edition, Evidence, section 499, pages 268-270, where it is said: "The corroborative evidence must in itself be of an inculpatory character and must tend to implicate the accused. It must also, without the aid of the accomplice's testimony, directly connect the accused with the commission of the specific crime, in such a way as reasonably to satisfy the jury that the accomplice is telling the truth, although the statute does not require that the corroborating evidence be such as to prove that the accomplice has told the truth. It is not sufficient that it merely connect him with the accomplice or other person participating in the crime. Nor is it sufficient if it merely shows the commission of the offense or its circumstances. It is however sufficient if it tends to connect him with the commission of the crime, even though it would be slight standing alone, and though it does not establish or

corroborate every fact or detail testified to by the accomplice or every element of the crime, or is merely circumstantial.

"The corroboration need not by itself establish the guilt of the accused, or be sufficient to sustain a conviction. It need not even establish the actual commission of the offense, or the connection of the accused with the crime beyond all reasonable doubt. If the accomplice is corroborated as to some material fact, the jury may infer that he has testified truthfully relative to other facts as to which he has not been corroborated. Where, however, the accomplice has been impeached and no credence can be given to his evidence, the corroborating evidence should connect the accused with the commission of the crime in a more positive manner than can be done by merely corroborating some of the details of the accomplice's story.

"Nevertheless, it is not sufficient that the corroborative evidence merely raise a suspicion of the accused's guilt, or show that he had opportunity to commit the crime or associated with the actual perpetrator.

"The testimony of one accomplice cannot corroborate that of another.

"The weight to be given to corroborative evidence is for the jury, whose verdict will not be disturbed unless it is clear that on no hypothesis can it stand. If the record discloses evidence apart from that of the accomplice which connects the accused with the crime, an appellate court will inquire no further in determining the sufficiency of the corroborative evidence."

In *People* v. *Trujillo,* 32 Cal.2d 105, 110-111 [194 P.2d 681], the Supreme Court lays down the following rules: "Such corroboration must create more than a suspicion of guilt, but is sufficient even though it 'be slight and when standing by itself, entitled to but little consideration.' (*People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354]; *People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720]; *People* v. *Shaw,* 17 Cal.2d 778, 803 [112 P.2d 241]; *People* v. *Yeager,* 194 Cal. 452, 473 [229 P. 40].) It is sufficient when the evidence offered as corroborative tends to connect a defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness. (*People* v. *Negra, supra; People* v. *Yeager, supra.*) For the same reason, it is not necessary that the independent

evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test.''

The opinion in *People* v. *Klopfer*, 61 Cal.App. 291, 296 [214 P. 878], states:

''In order to meet the requirements of Penal Code, section 1111, regarding the corroboration of an accomplice, it is not necessary that the evidence received be of a very strong nature. Although more is required by way of corroboration than to raise a mere suspicion (*People* v. *Thompson*, 50 Cal. 480), if the evidence, however slight, tends in and of itself to connect the accused with the commission of the offense, it is sufficient. [Citations.]'' (See also *People* v. *Morris*, 115 Cal. App.2d 312, 316 [252 P.2d 36] ; *People* v. *Slattery*, 59 Cal. App.2d 451 [139 P.2d 105] ; 11 Cal.Jur.2d, Conspiracy, § 28, p. 248; 54 Cal.Jur.2d, Witnesses, § 195, pp. 639-644; *People* v. *Bowley*, 230 Cal.App.2d 269, 271 [40 Cal.Rptr. 859] ; *People* v. *Walters*, 165 Cal.App.2d 326, 328 [331 P.2d 1037] ; 19 Cal. Jur.2d, Evidence, §§ 497, 498, 499, 500, pp. 265-271.)

The corroboration may consist of circumstantial evidence. (*People* v. *Darnold*, 219 Cal.App.2d 561 [33 Cal.Rptr. 369], cert. denied 376 U.S. 927 [11 L.Ed.2d 623, 84 S.Ct. 694] ; *People* v. *Spaise*, 193 Cal.App.2d 294, 297 [14 Cal.Rptr. 167] ; *People* v. *Wade*, 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].) It must raise more than a mere conjecture, but it is sufficient if it tends to show that defendant is guilty of the commission of the crime and this proof should be sufficient to satisfy the fact finding body of the truthfulness of the testimony of the accomplice. (*People* v. *Murphy*, 173 Cal.App.2d 367, 374 [343 P.2d 273].)

Two of the checks in question were cashed personally by the defendant Blackwell (counts 5 and 12), and he helped Williams to cash a third by furnishing identification for him (count 8). A male Negro answering the defendant's description was described as participating by witnesses in connection with other counts showing peculiarities of size, appearance, features or clothing. (*People* v. *Lewis*, 240 Cal.App.2d 546, 548 [49 Cal.Rptr. 579].) It is the function of the trier of fact, in cases of this kind, to pass upon the strength or weakness of testimony tending to establish identification. (*People* v. *Bookhammer*, 223 Cal.App.2d 278, 280 [35 Cal.

320

Rptr. 779] ; *People* v. *Robinson,* 102 Cal.App.2d 800, 806 [228 P.2d 583].) ▮ It is not always possible for a witness to identify an accused defendant with absolute certainty, or to swear positively that the man in question was the person who was seen in an incriminating situation. (*People* v. *Weiss,* 50 Cal.2d 535, 567 [327 P.2d 527] ; *People* v. *Cuellar,* 110 Cal. App.2d 273, 277 [242 P.2d 694].) But the right of the trier of fact to weigh evidence of this kind and to draw legitimate inferences from it, being a judgment with respect to the weight of such testimony and being addressed to the sound discretion of the trier of fact (*People* v. *Waller,* 14 Cal.2d 693, 700 [96 P.2d 344]), is not to be ignored by an appellate court if there is in fact substantial evidence to back up the conclusions of the jury. ▮ It was also shown repeatedly that the appellant possessed and used a bluish or blue-greenish, 1954 or 1956 Buick, that his hair was long and that he occasionally wore a goatee or mustache.

Frank Dominguez of the Sutter Super Market testified with respect to the crimes described in counts 3 and 4 that he cashed personalized Little Jack Nichols checks numbered 374 and 375 for Williams and for a black man who looked like appellant, although he believed that the man with Williams had longer hair and goatee or was unshaven.

The witness Ray Kendrick's testimony related to count 9. Williams cashed a check at the Plumas Food Market while he was accompanied by a man who had a goatee, which at times was a characteristic facial adornment of the defendant. A blue Buick was parked outside the store.

Count 10 related to the lone unpersonalized check in the group, which, however, was signed "Jack Nichols." Ed Williams cashed the check at the Wentz Market and witness Floyd Younger noticed the car because its occupants did not stop at the front of the store but drove around to the side; it was a blue 1956 Buick.

From the similarity of the method of perpetrating the crimes, appellant also was shown to be connected with the offenses described in the other counts. (*People* v. *Chapman,* 156 Cal.App.2d 151 [319 P.2d 8].) All of the checks were passed in Yuba City grocery stores and all of them contained the printed name of Little Jack Nichols, except one which set forth Nichols' name as a signature. All of the forgeries were passed in connection with small purchases during a relatively brief period. Such similarity in the commission of crimes in a given locality is itself a circumstance tending to corroborate

the testimony of an accomplice. (*People* v. *Robinson*, 184 Cal. App.2d 69 [7 Cal.Rptr. 202].)

There was also evidence that appellant refused to give a handwriting exemplar at the request of the authorities, although it is now established that handwriting exemplars raise no self-incrimination problem. (*Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].) The refusal to give such an exemplar in the circumstances thus arguably indicated a consciousness of guilt. The members of the jury also had before them the various checks introduced as exhibits, including the check in connection with count 10. As Williams testified that he personally witnessed appellant writing that check, the jury could have treated it as genuine and legitimately found appellant to have been the author of other checks in evidence pursuant to Code of Civil Procedure, section 1944.[1] (41 A.L.R.2d 575, 584.)

Assuming in favor of the verdict, as required on an appeal of this kind, every fact which the jury could reasonably infer from the evidence, Williams' testimony, in our opinion, was properly corroborated. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)

The second ground urged for a reversal is that on the third day of the trial the public defender's motion for a mistrial was denied; the basis urged below was that the "Appeal-Democrat," the only local paper in Sutter and Yuba Counties, had published an account of the opening day of the trial in which it was stated, among other things, that Blackwell was accused in the information of four prior felony convictions, two of which were dismissed and two of which he admitted. When the motion for a mistrial was made, the trial judge called each of the jurors separately into chambers and upon inquiry found that only one juror had read the article. A Mrs. Harris admitted that she had read the piece the night before; the judge asked her what she recalled concerning the article, and she said, "Well, it seemed to clear my mind about—I wondered why we were trying one person and not another, when they seemed to be in jail. And—." The court said, "You have to explain that to me." The defense counsel interrupted, saying, "I think we are more interested in the article rather than the personal feelings." And the court said, "That's right, but I want to get Mrs. Harris' impression of

---

[1]Repealed, Statutes 1965, chapter 299, p. 1362, operative January 1, 1967, subject matter is to be found in Evidence Code section 1417.

the article. What else do you recall about the article?" Mrs. Harris answered, "That it said that Mr. Williams, who was a witness yesterday, had confessed and was serving his jail term."

"The Court: Did you read the article from the first word to the last word?

"Mrs. Harris: Well, I believe I did, but I wouldn't quote the thing to you." And then the judge asked if she would give him her impression of what the article said, all of the alleged facts, and further stated, ". . . . in other words, we want to brainwash you as much as possible as to your impression of this particular article." Mrs. Harris answered, "I don't know if I can separate it from the article, what we have been hearing the last few days." The court then specifically instructed Mrs. Harris to disregard completely any impression or any information she may have received from the newspaper account, and not to consider or mention to the other jurors any impression or information allegedly received, or even to discuss with the other jurors that she had read the article.

The court denied the motion for nonsuit on the basis of its interviews with all of the jurors, individually. The juror Jones said that he had also read the paper, but not the article concerning the case; however, his wife had read it and he said, "I heard it"; his wife wondered out loud how long the trial would last and mentioned that his name was in the paper. The juror Crumby also said that his wife mentioned the newspaper account to him, but that he had not read the piece; she had stated to him that it was supposed to be a three-day trial.

The court reached the conclusion that no harm had been done to the defendant which would justify the granting of a mistrial. Respondent contends that the answers given by the jurors showed that the article caused no prejudice to appellant, and that appellant had not shown that adverse newspaper publicity had influenced the verdict of the jury. (*People* v. *Torres*, 185 Cal.App.2d 168, 172 [8 Cal.Rptr. 135].) Without such a showing, a conviction could not properly be reversed. (*People* v. *Barthel*, 204 Cal.App.2d 776, 780-781 [22 Cal.Rptr. 599].)

In the notorious case of *Sheppard* v. *Maxwell*, 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], the murder conviction of the defendant was set aside by the United States Supreme Court on the ground that outside accounts of the alleged crime and

of the trial were so unfair to him that he did not have his day in court. In England, a court may properly insist that newspaper accounts of a trial shall not go beyond the bare skeleton of the proceedings. But here, no such rule exists by law or custom. This hiatus has usually been partially corrected by the giving of an instruction by the court at the beginning of a trial that jurors shall not read any account of the case, or observe or hear by television or radio any statement relative to the trial. Presumably such an instruction is complied with by the jury and, if not followed, it may be enforced by a finding of contempt as against any juror who has not complied with such instruction. In the instant case, apparently no such specific instruction with respect to reading newspapers or listening to television or radio was given until the third day of the trial after defense counsel had made his motion for a mistrial. Then, the court very carefully told each juror after being questioned in chambers that he must not receive any impression as to the case from any outside account of what went on at the trial, but was to be governed solely by what he heard and saw as evidence in the courtroom. The *Sheppard* case, on its facts as shown by the opinion, differed sharply from the instant case. That opinion furthermore turns principally on the failure of the trial judge to exercise his unquestioned right to control conditions in and about the courtroom rather than to control the freedom of the press. (See *Estes* v. *Texas,* 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628].) We are of the opinion that the defendant has not shown that he was prejudiced, and we do not think that a reversal in the circumstances would be justified.

The prosecution, through the Attorney General, raises the question whether the defendant was subjected to double punishment through a finding of conspiracy to commit forgery and a finding of guilty also of the specific instances of forgery specified in later counts. The penalties prescribed by the Penal Code for conspiracy to commit forgery and for forgery are identical, and, therefore, we must look to other features of the trial in order to decide which sentence should be eliminated as we believe that double punishment has presently been prescribed. (*In re Cruz,* 64 Cal.2d 178 [49 Cal. Rptr. 289, 410 P.2d 825].)

The clerk's transcript shows as to how the sentences should be served by the following provision: ''It is ordered that sentences shall be served in respect to one another as follows

Counts 5 and 12 to run consecutive, and Counts 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, and 13 to run concurrent with the two consecutive sentences.'' This sentence is erroneous in that it says that the penalties on counts 1 to 4, 6 to 11 and 13, shall run concurrently with both counts 5 and 12, which are to run consecutively. Obviously, counts 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, and 13 must, if they are to be concurrent, run either with count 5 or count 12, or part with each, and not with both. In the circumstances, it is ordered that the defendant be returned to the court at Yuba City for resentence in accordance with the trial court's view of how the counts, other than 1, 5 and 12, are to be served. As heretofore stated, the judgment of conviction is affirmed as to all counts; as to count 1, the sentence only is set aside; with respect to counts 2, 3, 4, 6, 8, 9, 10, 11 and 13, the trial court shall specify which of them shall run concurrently with either of the sentences on counts 5 and 12, but not with both.

Stone, J., and Gargano, J., concurred.