[Crim. No. 1763. First Appellate District, Division One.—May 29, 1934.]

THE PEOPLE, Respondent, v. HUGH S. G. BROWN, Appellant.

Vincent W. Hallinan and William F. Herron for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

CASHIN, J.—Defendant was found guilty of the crime of rape, and has appealed from the judgment of conviction and an order denying his motion for a new trial.

As grounds for his appeal he contends that the evidence was insufficient to support the verdict, and that the trial court erred in refusing to permit certain questions to be asked on cross-examination.

The prosecuting witness, who resided in Oakland, testified that on the evening of April 13, 1933, she attended a dance at Neptune Beach in Alameda, where she met the defendant. At the conclusion of the dance defendant offered to take her to her home in his automobile, and she accepted the invitation. Instead of proceeding toward Oakland defendant drove in the opposite direction, stating that he wished to stop at the Oakland airport to see if his brother had arrived by plane. They left the airport, and defendant drove off the main highway and. proceeded along a dirt road into Contra Costa County, where he stopped the car. He then made improper advances, whereupon the prosecutrix left the car and ran down the road. How far she went is not clear. According to her testimony they had crossed a bridge before she left the car, and in response to a question as to how far she proceeded she answered "I don't know. Anywhere between the car and the bridge, and the bridge was about half a mile from the position of the car." It appears that the defendant also left the car and followed her. She testified that at no time did he strike or threaten her, but that he forced her to return to the car, where he renewed his advances. She again left, and he followed, forcing her to re-enter the car, where he accomplished an act of sexual intercourse. The point where the car stopped was about fifty yards from a farmhouse. The prosecutrix testified she did not scream, and on account of her physical position in the car she was unable to resist by kicking. In response to a question whether she scratched the defendant she replied "No, I did not scratch. I am not in the habit of scratching people." She was twenty-five years of age, weighed about 140 pounds and had participated in athletics such as tennis and swimming. She testified that she feared the defendant and she did not consent to the act and that she resisted until she

"lost all strength and control". With respect to what subsequently occurred she was asked "Then after the offense was committed what did you do?" She replied, "He simply said to relax and he was tired out and he could not go on yet, and he stayed there for a few minutes, and I just hoped and prayed he would make up his mind to go home, and he finally said he did not have any gas in the car and said he would have to go after some." The defendant then left the car, and after a few minutes the prosecutrix followed and proceeded toward Oakland. She was met by a truck driver, to whom she complained and who took her to his home. The truck driver testified that the prosecutrix was weeping and asked him to protect her, and that the place where they met was several miles from Oakland. The sheriff of the county was notified, and she was taken to his office, where she repeated her story. A physician who examined her on the same day testified that he found a lacerated condition, which indicated sexual intercourse had taken place within the preceding twenty-four hours. He noticed no bruises on her body or limbs, but an officer testified that there were such on her knees and arms.

The defendant did not deny the fact of intercourse, but testified that while the prosecutrix did not expressly consent, she did not resist. He denied the use of force or intimidation, claiming that he persuaded her to submit to his advances. He contends that the prosecutrix's own testimony shows that she did not resist to the extent of her ability and that therefore the conviction cannot be sustained.

Under the code, proof of resistance on the part of the female until overcome by force or violence is essential (Pen. Code, sec. 261; *People* v. *Brown,* 47 Cal. 447); and it has been said that she must exert every physical means or faculty within her power to resist the outrage. (52 Cor. Jur., Rape, sec. 29, p. 1019.) It has been held, however, that the rule of "resistance to the uttermost" is not absolute; and with respect to the degree of resistance required it is necessary not that the prosecutrix should have made the utmost resistance, but that she made such resistance as she was capable of making at the time (*People* v. *Cline,* 117 Cal. App. 181 [3 Pac. (2d) 575]; *People* v. *Norrington,* 55 Cal. App. 103 [202 Pac. 932]. See, also, 52 Cor.

Jur., Rape, sec. 29, and cases cited); and that the question whether her resistance was genuine and *bona fide* was one for the jury. (*People* v. *Norringer, supra.*)

While there was sufficient evidence to go to the jury on the question of guilt, the circumstances disclose a case where a verdict for the defendant would have been fairly supported. As shown, the prosecutrix's account of the affair taken in connection with the physical circumstances contains much that is equivocal; and where the question of guilt or innocence is close, as here, any material error in the admission or rejection of testimony might readily have turned the scales against the defendant.

■ The following question was asked the prosecutrix on cross-examination: "Well, Miss Miller, is it not a fact that you, immediately after preferring these charges against Mr. Brown, you asked that they be dismissed?" An objection that the question was "incompetent, irrelevant and immaterial, not within the province of this prosecutrix to dismiss any charges", was sustained.

This was proper cross-examination (*Denton* v. *State,* 46 Tex. Crim. Rep. 193 [79 S. W. 560]; *Conger* v. *State,* 63 Tex. Crim. Rep. 312 [140 S. W. 1112]; *People* v. *Jones,* 160 Cal. 359 [117 Pac. 176]; *People* v. *Webber,* 26 Cal. App. 413 [147 Pac. 102]; *People* v. *Williams,* 43 Cal. App. 60 [184 Pac. 498]), as the jury may properly consider the conduct of a prosecutrix toward the defendant after the alleged commission of the crime. (*People* v. *Jaramillo,* 137 Cal. App. 232 [30 Pac. (2d) 427].) The question was preliminary; and it has been held that the general objection is insufficient to raise the special point that, being an impeaching question, the foundation of time, place and persons present was not laid. (*People* v. *Hart,* 153 Cal. 261 [94 Pac. 1042].) An affirmative answer would, unexplained, have been relevant evidence of her consciousness of defendant's innocence. ■ It has frequently been said that in this class of prosecutions the defendant, owing to natural instincts and laudable sentiments on the part of the jury and the usual circumstances of isolation of the parties involved in the commission of the offense, is as a rule so disproportionately at the mercy of the prosecutrix's evidence that he should be allowed the widest latitude in cross-examination compatible with the rules of evidence.

(*People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506]; *People* v. *Baldwin,* 117 Cal. 244 [49 Pac. 186]; *People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129]; *People* v. *Biescar,* 97 Cal. App. 205 [275 Pac. 851].) And where, as here, there was evidence sufficient to support defendant's version of the affair we cannot say that an affirmative answer to the rejected question, taken with the flippant reply of the prosecutrix to the question whether she scratched the defendant, would not have convinced the jury that her story was untrue. In the circumstances the ruling was, we think, prejudicially erroneous and, as a reasonable probability, resulted in a miscarriage of justice.

The judgment and order was accordingly reversed and the cause remanded for a new trial.

Tyler, P. J., concurred.

KNIGHT, J., Dissenting.—As will be noted, the majority opinion concedes that the evidence is legally sufficient to sustain the verdict, but reverses the judgment of conviction upon a ruling of the trial court sustaining an objection to a general question propounded to the prosecutrix on cross-examination. In this regard the majority opinion states in substance that much of the prosecutrix's account of the affair is equivocal, that the question of appellant's guilt is close, and that therefore the ruling complained of was prejudicial and probably resulted in a miscarriage of justice. I am unable to agree with these conclusions.

As is usual in cases of this kind the testimony given by the prosecutrix and the accused is conflicting as to the extent of force and violence used in accomplishing the act constituting the alleged crime; but admittedly under such circumstances it is the exclusive province of the jury, as the fact-finding body, to decide which of the parties has told the truth. In the present case the jury accepted as true the account given by the prosecutrix and acted upon the same in finding appellant guilty. It must be presumed on appeal, therefore, that her testimony is true; and in the light of such presumption it would seem that her account of the affair cannot be said to be equivocal. Moreover, her conduct immediately following the alleged assault, and the physical and mental condition in which she was

found at that time, as established by the testimony of disinterested witnesses, strongly supports her claim that she was assaulted wholly against her will and as a result of violence and the use of superior force coupled with a feeling of fear, brought about by a realization that at that late hour of the night she found herself alone in the foothills of a sparsely-settled country that was entirely strange to her, with a man whom she had met for the first time only a few hours before, and who had succeeded through trickery in bringing her there.

In this connection the evidence shows she had no relatives living in this state. She had resided in Oakland only about a year and a half, and in the state less than two years, and was entirely unfamiliar with the territory surrounding Oakland or the location or termination of the highways in those regions. Consequently, after having accepted appellant's invitation to drive her home in his car, she was not aware at first, so she stated, that he was proceeding in the opposite direction, but as soon as she became aware of the fact she called his attention to it, and was told. by appellant that there were several ways of reaching Oakland, and besides that he wanted to go to the airport to see if his brother had arrived. Upon receiving information at the airport to the contrary, he purchased a small quantity of gasoline. It was then considerably past 1 o'clock in the morning, and instead of turning back toward Oakland he again started in the opposite direction and soon turned from the main highway on to a dirt road leading into the foothills, toward Contra Costa County. The prosecutrix, realizing they were not headed for Oakland, again protested; and appellant finally admitted they were not on the right road. About this time the car stopped. It had run out of gasoline, but as appellant admitted at the trial, he did not at that time disclose this fact to the prosecutrix. As soon as the car stopped he began making his advances. Repulsing him, she got out of the car and ran down the road. Appellant followed her and brought her back; she claimed she was forced or dragged back. Appellant claimed he "persuaded" her to come back, that he "certainly wasn't going to hurt her". The car was an Essex coach, and after the prosecutrix broke away the second time appellant threw the "jump" seat forward; and upon re-

754

turning to the car the second time with the prosecutrix he picked her up bodily, so she testified, and shoved her into the car, on the floor, face downward. She testified that during the struggle which ensued she used all her strength "to keep him away, keep him at a distance . . . threw him back to the wheel of the car, tried to knock him out"; that she "resisted with every ounce of strength" she had; that she was powerless to kick him because her leg was caught in the front seat. Following the assault appellant informed her that the gasoline supply was exhausted, and he took a pail and proceeded to walk down the road to see if he could obtain gasoline from some farmhouse. It was then daylight; and after he disappeared down the road the prosecutrix got out of the car and ran back toward the main highway. After running a short distance she met a farmer named Cronin coming in the opposite direction, driving a truck. He was on his way to a field to get a load of hay. She hailed him, and told him what had happened. In this respect Cronin testified: "She was coming down the road and I was going up the road for a load of hay and she waved her hand and I stopped. She was crying. The first question she asked me, 'Where am I?' I didn't know what she meant and I said, 'What do you mean?' She said, 'How far am I from Oakland?' I said, 'You are about twenty-three miles.' Just then an Essex car drove up and a man was in it, and she said, 'Don't let that man get me', and I said, 'What's wrong?' She said, 'He had me up in the hills here all night', and I said, 'Then step in the truck here', and the man drove by in the machine and I got out, but he didn't stop, he just drove down the road slow, and I could see from looking in the back mirror." Cronin further testified that when the prosecutrix hailed him "she was crying and seemed to be awfully excited and nervous". He took her on the truck, drove on a short distance, got his load of hay and then drove back to his home in Dublin; and at the prosecutrix's request he phoned for an officer. Constable Vervais of Pleasanton responded, and in describing the prosecutrix's condition as he saw it upon his arrival there, Vervais testified that "she was like was all wore out. Her clothes were all mussed up"; appeared "awful nervous" and was crying. He furth. stated that "she had a mark on her leg and one on her ar

and a mark on her neck''. Vervais conveyed her to the district attorney's office in Oakland, and it was ascertained that the alleged assault doubtless occurred in Contra Costa County, whereupon Vervais drove the prosecutrix back to the scene of the alleged assault, and then to Danville, Contra Costa County. There they met Constable Read of that county, and that afternoon the prosecutrix was taken before Dr. M. C. Bollender in Danville for an examination. Bruises were found on both knees and on her arms and there was a black and blue spot on the side of her face, near the throat, and the doctor testified that as a result of his examination he found her sexual parts lacerated, and ''a virginal type of hymen'', which in his opinion showed that intercourse had taken place for the first time within the previous twenty-four hours. Four or five days later appellant was located in Oakland, identified by the prosecutrix and placed under arrest.

There is no intimation anywhere in the record that the prosecutrix was actuated by any motive to unjustly cause the arrest of appellant, whom as stated she had known less than half a day, and thereby expose herself to humiliation and notoriety which was bound to follow her appearance as a witness at a public trial in a case of this kind. And the answer to the argument that the prosecutrix did not scratch appellant, nor scream, may be found in language used in *People* v. *Norrington,* 55 Cal. App. 103 [202 Pac. 932], wherein the court says that the conclusion reached in some cases that unless a woman ''kicks, bites, scratches and screams'' to the ''utmost of her power and ability'' she will be deemed to have consented and indeed to have invited the familiarity is ''neither justice, law, nor sound reason''.

With respect to the question of the soundness of the ruling upon which the majority opinion bases the reversal, it may be conceded that on account of the nature of the charge, the trial court might well have allowed the question in dispute to be answered. But technically, from an analysis of that portion of the record, it would seem that its ruling sustaining the objection thereto was not erroneous. As held in the cases cited in the majority opinion, preliminarily, for the purpose of laying foundation for impeachment, or to show either friendliness or unfriendliness of a witness toward the accused, a general question is permissible. But

it does not appear that the general question here propounded was asked for any of those purposes. At least if it was, such purpose is not manifest from the question itself, nor was it disclosed by counsel at the time of asking it. The record relating thereto is as follows: "Q. Well, Miss Miller, isn't it a fact that you immediately after preferring these charges against Mr. Brown, you asked that they be dismissed? Mr. Collins [deputy district attorney]: Objected to as incompetent, irrelevant and immaterial, not within the province of this prosecuting witness to dismiss any charges. The Court: Objection sustained." There the matter ended, no further reference being made thereto. Obviously, as stated by the district attorney in his objection, it is not within the province of a prosecuting witness in a case of this kind to dismiss the charge. If, therefore, the purpose of the general question was to elicit testimony leading to impeachment or to show the state of mind or conduct of the witness toward the accused, it would seem that it was incumbent on counsel for appellant so to state at the time, or to reframe the question, and having failed to do either, that it is too late to disclose the purpose for the first time on appeal.

For the reasons stated, I do not believe that sufficient legal grounds for reversal have been shown.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 28, 1934.