[Crim. No. 8568. Second Dist., Div. Two. Sept. 26, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ERICH REINARD, Defendant and Appellant.

Alexander H. Schullman for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, H. Warren Siegel and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

ASHBURN, J.—Convicted of commission of abortion (Pen. Code, § 274) upon Mrs. Dorothy Schwartz on September 1, 1961, defendant, a medical doctor specializing as an internist, appeals from the judgment.

█ Counsel's principal argument is insufficiency of the evidence, a position which the record plainly does not support. The " 'test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt.' " (*People* v. *Poindexter,* 51 Cal.2d 142, 148 [330 P.2d 763].) █ We must accept as established all evidence favorable to the respondent and assume that the jury rejected, as it had a right to do, that or any part of that presented by the defendant. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911] ; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Thus arrayed, the proofs show the following sequence of events.

█ Mrs. Schwartz, who was in perfect health, was advised by her family physician that she was pregnant and she so believed. Through a friend, Don McCandless, she located and made an appointment to see defendant. She arrived at his office in Los Angeles at about 3 p.m. on Friday, September 1, 1961, being driven in her car by Mr. McCandless. After waiting a while in the reception room they were invited by defendant into his private office. They entered and both were present at the conversation then had. Mrs. Schwartz told defendant she had a very unwanted pregnancy and understood he was going to take care of the situation for her. He asked where she got that idea and she said an appointment had been made for her. Defendant said he would not do it. She cried and begged him and he brought up the question of the fee, inquiring if she had any idea what that would cost. At this point, according to the testimony of McCandless, "they started haggling over the terms." She said she had been told it would be $300. " 'Well, that just shows how misinformed you are because that is the price that it used to be, but it costs much more than that.' And I asked him what it cost, and he said, '$500.00.' And I said, 'I didn't have that much money.' He says, 'How much money do you have?' And I said I had $300.00." Mrs. Schwartz then asked McCandless if he had money, as she pulled out her own wallet. He gave the doctor $100 and she produced and handed him $310, whereupon he agreed to perform the

operation. No receipt for the $410 was requested or given. The automobile was parked at the curb so defendant told McCandless to move it, come back and wait in the waiting room and not leave. He did place it in a less conspicuous place and waited in the office as directed.

In the examining room defendant had Mrs. Schwartz go to the toilet, remove her undergarment, lie on the table with the stirrups in the operating room, and he gave her two injections of penicillin. First he inserted a speculum into her vaginal cavity, then inserted something else which "felt like it was being attached to me, and a very painful pulling, and I think that was done about seven or eight different times. ... Well, we went through this pulling routine for a long time, and I kept asking him if he was about through, and he said just a few more minutes. And then when he was through with that pulling, he went in and did a scraping sensation." Also: "By the time he was through with the scraping, the speculum fell out on its own, and he did no more inserting of instruments, but he did put in a packing, a gauze packing that had quite a few knots in the tail, and he told me to leave that packing in until the following morning, and then to take it out myself." The pain was so very excruciating that she screamed and defendant told her several times to quiet down. During the operation defendant told her she was about two months pregnant and "that I was no longer pregnant, when he completed the operation he said I had no longer any pregnancy." She was told to go home, to bed and stay flat for five days. Going through the office on her way out she reached for one of defendant's cards on the desk but was told by him not to take one, and not to call him under any circumstances; that if she felt she had to see him to come on the following Thursday after 10 a.m. Defendant also said everything was fine and anything that happened would be normal. He gave her no pills to take with her. Through that evening and Saturday she was quite uncomfortable and by bedtime on Saturday the pain was so intense she could not take it and her husband took her to St. Francis Hospital.

 The foregoing facts are taken mainly from Mrs. Schwartz' testimony. McCandless corroborated it in important particulars. Through a friend of his he arranged an appointment with defendant for Mrs. Schwartz; he drove her to the office on the same day. He was present and heard her say to defendant that she had a pregnancy and "wanted an abortion." Defendant disclaimed any appointment and refused

to perform such an operation. She cried and begged and the haggling on terms began, he finally agreeing on $400; they actually paid him $410. When McCandless was called into the inner office after waiting as directed, he asked "if there was some medication that he wanted to give her, or some kind of prescription that he would let her have, and he said, no, that he didn't want to write a prescription, he didn't want his name on it." Also: "Mrs. Schwartz asked him for a card, or went to pick one up, I guess it was, that was, I believe at the time he told her that he didn't want any telephone calls from her, or any further contact. If she did have some trouble, he mentioned the date, I guess it was three or four days later to return at his regular hour call time if she had experienced any difficulty. And so then he escorted us not out through the same office that we had entered, but through a hallway and out another door and back out on to Soto Street. So I walked her to her car and to her home." Mr. McCandless was promised immunity for testifying in this case and appellant's brief correctly refers to him as an accomplice.

Testimony of another young woman that she had been aborted by defendant on June 1, 1961, was received by way of corroboration over defendant's objections. It will be discussed later in connection with the claim of error in receiving such evidence, but that testimony is not of consequence in consideration of the Schwartz count for her testimony is adequately otherwise corroborated.

General principles here applicable are the following. ▪ The aborted woman is not an accomplice of the defendant who commits the offense (*People* v. *Clapp,* 24 Cal.2d 835, 837 [151 P.2d 237]), but she must be corroborated (Pen. Code, § 1108). ▪ Accomplices "are persons who participate in the commission of a crime, either by committing the act directly, aiding in its commission, or advising and encouraging its commission." (*People* v. *Clapp, supra,* at p. 837.) ▪ The abortee is considered the victim of the crime ( 1 Witkin, California Crimes, § 576, p. 520), and she may be corroborated by an accomplice of defendant. ▪ Although an abortee is not an accomplice, the test to be applied to corroboration of her testimony is that of section 1111, Penal Code (*People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257]), which section says: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is

728

not sufficient if it merely shows the commission of the offense or the circumstances thereof.''

The corpus delicti of abortion consists merely of an attempt to produce a miscarriage. (*People* v. *Berger*, 131 Cal.App.2d 127, 129 [280 P.2d 136]; *People* v. *Wilkes*, 177 Cal.App.2d 691, 700-701 [2 Cal.Rptr. 594]), which implies specific intent based upon knowledge or belief of pregnancy on the part of the defendant, and absence of necessity to preserve the abortee's life. (1 Witkin, California Crimes, §§ 582-583, pp. 524-525; *People* v. *Gallardo*, 41 Cal.2d 57, 62 [257 P.2d 29].) Proof of actual pregnancy or a completed miscarriage is not necessary (1 Cal.Jur. 2d § 11, p. 159; *People* v. *Pollum*, 97 Cal.App.2d 173, 177 [217 P.2d 463]), provided defendant believes the woman pregnant and acts with intent to induce a miscarriage (1 Witkin, California Crimes, § 580, p. 522).

The corroboration required by the statute need not go to the corpus delicti but to defendant's connection with same once it has been established by other evidence; it need relate only to some act or fact which is an element of the offense. Such is the language of Penal Code section 1111, quoted, *supra*, and the settled holding of the courts (*People* v. *Gallardo*, *supra*, 41 Cal.2d 57, 62-63). One abortee may corroborate another in many instances, i.e., in situations such as stated in *People* v. *Davis*, 43 Cal.2d 661, 675 [276 P.2d 801]: ''Either one of the women upon whom an abortion was performed can act as a corroborating witness with respect to matters which she may have observed that are relevant to the other count charging the performance of an abortion upon the other woman. [Citation.] The independent testimony of the two victims of abortion is mutually corroborative in that it shows that both abortions were committed in a similar manner following the same procedure. [Citations.]''

McCandless was undoubtedly an accomplice (see, Pen. Code, § 31; *People* v. *Gallardo*, *supra*, 41 Cal.2d 57, 63; *People* v. *Bowlby*, 135 Cal.App.2d 519, 527 [287 P.2d 547, 53 A.L.R.2d 1147]; *People* v. *Kutz*, 187 Cal.App.2d 431, 436-437 [9 Cal.Rptr. 626]), and his testimony competent to corroborate Mrs. Schwartz; it did so fully upon the important element of defendant's connection with the crime.

Moreover, as stated in Witkin on California Evidence, section 489, at page 545: ''Sufficient corroboration may be furnished by the defendant's own testimony, his admissions or confessions, or his silence in the face of an ac-

cusatory statement. ▮ The entire conduct of the parties, their relationship, acts, and conduct during and after the crime, may be considered. ▮ The corroboration need not extend to all elements of the offense, nor to every detail in the testimony of the accomplice. It need not be strong; it is sufficient if it tends in some slight degree to implicate the defendant. ▮ It need not be direct; circumstantial evidence is sufficient if the connection of the defendant with the crime may be reasonably inferred therefrom. ▮ In brief, the corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth."

▮ *People* v. *Goldstein,* 136 Cal.App.2d 778, 788-789 [289 P.2d 581] : " '... For the same reason, it is not necessary that the independent evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test.' [Citations.]"

▮ Defendant's testimony denied most of the essential facts covered by the prosecution witnesses but it also furnished corroboration of his connection with the crime to which Mrs. Schwartz had testified. He said that Mr. McCandless did bring Mrs. Schwartz to his office where she sought an abortion (though he fixed a different date); that both were in the inner office when a conversation occurred; that she became hysterical, "hollered" and "yelled." ▮ "So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' [Citations.] It may consist of testimony of the defendant and inferences therefrom as well as inferences from the circumstances surrounding the criminal transaction [citations], and it need not establish the precise facts testified to by the witness whose testimony it supports." (*People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720].)

▮ We entertain no doubt of the adequacy of the proof of the corpus delicti or of the sufficiency of the corroboration. Mrs. Schwartz' testimony sufficiently establishes that she told defendant she was pregnant, he agreed to do an abortion, made an examination and then entered upon an in-

tensely painful procedure which lends itself to no explanation other than an abortion or an attempt to commit one (which is the same thing under the statute); he told Mrs. Schwartz she had been pregnant but was no longer in that condition; his belief and his intent are clearly shown, as is the fact that the operation was not necessary to preserve her life, she being in good health. Mr. McCandless amply corroborated the abortee's testimony; he was present when the agreement was reached that defendant do an abortion on Mrs. Schwartz for $400, and he participated in paying the fee; this and other testimony given by him constituted legally sufficient corroboration of defendant's connection with the crime to which Mrs. Schwartz had testified.

Appellant's arguments of insufficiency of the evidence are built mainly upon actual or asserted inconsistencies in the testimony of various witnesses but they do not surmount the hurdle of *People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758]: "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]"[1] The rule above quoted has been reiterated in *Lockheed Aircraft Corp.* v. *Industrial Acc. Com.,* 28 Cal.2d 756, 760 [172 P.2d 1]; *People* v. *Greer,* 30 Cal.2d 589, 594 [184 P.2d 512]; *People* v. *Simpson,* 43 Cal.2d 553, 562 [275 P.2d 31]; *People* v. *White,* 43 Cal.2d 740, 747 [278 P.2d 9]; *People* v. *Lyons,* 47 Cal.2d 311, 319-320 [303 P.2d 329]; *People* v. *Wein,* 50 Cal.2d 383, 399 [326 P.2d 457]; and by a long line of decisions of the District Courts of Appeal.

Claim of error in receiving over vigorous objections testimony of another alleged abortee (whom we will call

[1]This case was overruled in *People* v. *Burton,* 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433], but upon a point having no relation to the above quotation.

Mary Sue) cannot prevail. As above shown, the proofs were entirely sufficient to establish the Schwartz abortion without aid of Mary Sue's experience. The information did not specify that crime and the date fixed by her was June 1, 1961, while the Schwartz abortion was on September 1, 1961, three months later. But these are inconsequential differentiating circumstances. Mere remoteness of time does not render the Mary Sue abortion incompetent but goes merely to its weight. (*People* v. *Morani*, 196 Cal. 154, 159 [236 P. 135]; *People* v. *Kearns*, 149 Cal.App.2d 113, 121 [307 P.2d 1015].)

 The general rule is that evidence of an abortion upon a woman other than the prosecuting witness is admissible to show intent, preparation, guilty knowledge, identity, scheme, plan or design. (*People* v. *Vosburg*, 123 Cal.App.2d 535, 536 [266 P.2d 927].) It is said in 1 California Jurisprudence 2d section 30, page 179: "Evidence of other offenses of a similar nature committed by the defendant is therefore admissible for the purpose of proving intent and is also admissible to rebut the defendant's claim that the operation was innocently performed and for a lawful purpose.... [S]uch evidence is relevant if it logically tends to prove the defendant's intent in the offense under investigation, notwithstanding that it may prove a distinct crime and prejudice the defendant before the jury, and that it may tend to prove the defendant was preparing to commit abortions generally. Remoteness in time of the previous abortion is not material."

 The similarity between the Schwartz and the Mary Sue experiences with defendant is striking. Mary Sue testified she was pregnant but otherwise in good health, went to Dr. Reinard on June 1, 1961, pursuant to appointment made with him. He asked how far along she was and she told him three months. He said it would cost her $500 to help her get rid of the baby; she said she had only $350; he told her to show him and she counted it into his hand, whereupon he said that would be enough if it was all she had, took the money but gave no receipt and was not asked for one. Defendant told Mary Sue to remove her undergarment, get onto the table and put her feet in the stirrups. This she did and the doctor gave her a shot in the hip and one in the arm to dull the pain. He then inserted several instruments in her vagina and she had "very bad pain, it was like my, he was pulling my insides out." Defendant said he could not get rid of the baby right then but in a couple of days she would have a miscarriage; that she should be in bed not over a week and

there would be just a little pain. By the time she reached home her stepfather had to carry her because she could not walk. She was taken to the emergency hospital, called her family physician Dr. Copeland, who in turn called Dr. Petoyan in consultation. At the Northridge Hospital she was seen by Dr. Petoyan who testified this was on June 1, 1961, and a ''pelvic examination showed a foul bloody discharge covering the vulva, that is the outside of the female genitalia. And the vagina was filled with recently clotted blood. ... My impression at that time was acute pelvic inflammatory disease, secondary to a probably induced abortion. ... And I was afraid that she might have a perforation of her uterus. That essentially were my findings.''

Police Lieutenant Gray visited defendant at his office on June 8, 1961, said he was the stepfather of Mary Sue who was in critical condition and short of money, accused defendant of an illegal abortion upon her and asked for return of the fee. Defendant said: '' 'I treated her for an infection for the vaginal infection.' He said, 'But I do feel sorry for you, and I will give you the fee back.' '' He gave the $350 to the witness.

This evidence was competent and properly received. Before Mary Sue testified defense counsel raised vigorous objections to her doing so. When same were overruled he moved for a mistrial, a tactic which was often repeated after adverse rulings upon evidentiary matters. Of course there was no merit in the motion and it was properly denied.

▆▆▆ Appellant claims error in the court's refusal to permit his attorney to examine Lieutenant Gray upon the question of whether after arresting defendant on September 1, 1961, the police did not fail to file any charge against him; also refusing to permit examination of Mary Sue as to whether she knew such to be the fact. Plainly, the bare fact that no charge was filed would not be competent, for it would have no tendency to impeach Mary Sue's testimony. So far as her knowledge of the fact (if it were one) is concerned, it would have no legitimate impeaching effect even if the question were answered affirmatively. What the police may have thought of her story would be a combination of conclusion and hearsay so far as she was concerned, hence not competent. However, Officer Paul LePage, called by defendant in surrebuttal, was permitted to testify that defendant was scheduled to appear in department 100 (of the superior court) on June 8, 1961 ''on a Writ Return'' and that no

complaint was issued at that time. If there had been error in the previous rulings it seems to have been cured, but as indicated we find no such error.

Reliance upon *People* v. *Brown*, 138 Cal.App. 748, 751 [33 P.2d 460], is misplaced. The prosecuting witness in a rape trial was asked whether she had requested dismissal of the charges against defendant immediately after preferring same and the appellate court held it was error to sustain an objection to the question. An affirmative answer would have reflected directly upon her credibility and the situation presents no true analogy to the one at bar.

▋ Appellant's counsel asserts error in giving and refusing certain instructions. His whole argument in this connection consists of citations of the numbers of the instructions and the transcript pages at which same may be found —to which he adds: "The legal authorities cited under the instructions 'Refused' and the cases hereinabove cited, represent the authority for the serious error committed by the Trial Court with respect to these instructions." This is not sufficient.

▋ Volume 4 California Jurisprudence 2d section 480, page 309: "It is the office of a brief attacking a decision to point out the errors complained of, as shown in the record, to state the points on appeal separately under appropriate headings, to give arguments and authorities in support of the points made, and to show that the errors resulted in prejudice to the substantial rights of the appellant. ▋ Thus, while counsel for the appellant is entitled to be heard upon every error which he deems it his duty to raise as ground for reversal, the appellate court cannot be expected to search the record or prosecute an independent inquiry for errors on which the appellant may be relying. It will notice only those errors pointed out in the brief, and all others may be deemed waived or abandoned." ▋ *Id.* section 484, page 318: "The points made in a brief must be supported by argument or citation of authority or they will not be considered by the reviewing court, but will be deemed without foundation, without prejudice to the appellant's rights, or to have been waived or abandoned. The appellate court cannot be expected to prosecute an independent inquiry to find reasons for or against the rulings of the trial court, and it is the duty of counsel by argument and the citation of authority to show why rulings complained of are erroneous. It is not

sufficient merely to state the error without showing of what it consists.''

Another point urged by appellant is: ''The appellant's rights guaranteed under the Fourteenth Amendment to the Constitution of the United States of America were violated in that he was convicted upon evidence incorrectly admitted by the court, which represented a violation of procedural due process and as a result of highly inflammatory and prejudicial opening and closing remarks of the district attorney.'' This reminds one of the observation of the Pennsylvania Supreme Court in *Commonwealth* v. *Philadelphia & Reading Coal & Iron Co.*, 145 Pa. 283 [23 A. 809], that the Fourteenth Amendment is one of ''those last resorts of desperate cases.'' Repeatedly throughout the trial defense counsel, after an adverse ruling upon a question of evidence, sought and even demanded a continuance to enable him to procure a writ of prohibition from an appellate court, a thing to which he manifestly was not entitled; of course the motions were denied.

Due process has taken on such novel forms in recent months and years that it is difficult to harness and hold it within reasonable limits. But it seems to be settled and we now hold that '' [t]he guaranty is a matter of substance, not of form. It does not guarantee against judicial error, and it does not provide any guaranty against unjust or erroneous decisions, or assure uniformity of judicial decision, or guarantee any particular decision; it is not a guaranty that every court ruling shall be correct, but it is a guaranty that the fundamental principles of justice shall not be violated.'' (16A C.J.S. § 569 (1) p. 564.)

In *Housing Authority* v. *Arechiga*, 203 Cal.App.2d 159, 165 [21 Cal.Rptr. 464], this court said: ''True, that ruling now appears to have been erroneous in the light of the *Bellflower* decision. But the fact of error therein does not support appellants' argument of denial of due process or other constitutional rights. As said in *Worcester County Trust Co.* v. *Riley*, 302 U.S. 292, 299 [58 S.Ct. 185, 82 L.Ed. 268, 275]: 'In any case the Constitution of the United States does not guarantee that the decisions of state courts shall be free from error, *Central Land Co.* v. *Laidley*, 159 U.S. 103 [16 S.Ct. 80, 40 L.Ed. 91]; *Tracy* v. *Ginzberg*, 205 U.S. 170 [27 S.Ct. 461, 51 L.Ed. 755], or require that pronouncements shall be consistent. *Milwaukee Electric R. & Light Co.* v. *Wisconsin*, 252 U.S. 100, 106 [40 S.Ct. 306, 64 L.Ed. 476, 480, 10 A.L.R 892, 897].'

"*Datta* v. *Staab*, 173 Cal.App.2d 613, 621 [343 P.2d 977] : 'Due process does not guarantee either a correct decision or consistency in decision.' "

■ *Market Street R. Co.* v. *Railroad Com. of Cal.*, 324 U.S. 548, 562 [65 S.Ct. 770, 89 L.Ed. 1171, 1182] : "But due process deals with matters of substance and is not to be trivialized by formal objections that have no substantial bearing on the ultimate rights of parties."

*Gryger* v. *Burke*, 334 U.S. 728, 731 [68 S.Ct. 1256, 92 L.Ed. 1683, 1686-1687] : "We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question." To the same effect see, *Bottone* v. *Lindsley* (10th Cir.) 170 F.2d 705, 707; certiorari denied in 336 U.S. 944 [69 S.Ct. 810, 93 L.Ed. 1101] ; *In re Los Angeles County Pioneer Society*, 40 Cal.2d 852, 865 [257 P.2d 1] ; *Melancon* v. *Superior Court*, 42 Cal.2d 698, 706 [268 P.2d 1050] ; *Hughes* v. *Heinze* (9th Cir.) 268 F.2d 864, 866, 869.

■ Alleged misconduct of the prosecutor does not find substantial support in the record. In his opening statement to the jury the deputy district attorney said that Mrs. Schwartz was examined by Dr. Juler at the St. Francis Hospital "and he found that there was a criminal abortion or induced abortion." Immediately after this opening statement defense counsel assigned the reference to criminal abortion as misconduct and basis for a mistrial. The deputy district attorney said : "I do not feel that I have committed misconduct, and I have done it in good faith. I submit the matter to the Court. MR. SCHULLMAN: May I add to it, I, knowing Mr. Galliano, I want to say for the record I am satisfied he did it in good faith." Later, defendant's attorney remarked : "I will say this, that we don't know whether it can be cured by an admonition of the Court, but we think the Court could attempt to admonish the jury to disregard the statement of counsel with respect to both the victims, to the conclusion of the doctor with respect to criminal abortion, with respect to the fact that somebody suffering in a hospital." The court announced a recess and in doing so told the jurors : "And again I do want to say, too, that opening statements are not evidence in any sense of the word. The evidence that you are to be concerned with comes from the witness stand, from the lips of the witnesses that are under oath, or documents or

exhibits that may properly be admitted into evidence, that is your first concern, and then the law, the complete instructions as to credibility of witnesses and all of the general propositions of law and specific propositions of law that apply to this case will come from the judge at the conclusion of the trial, not from any counsel.'' Defendant's motion for a mistrial was denied.

When Dr. Juler, the first witness, was testifying he said he examined Mrs. Schwartz on September 4, 1961, and found she had ''a purulent vaginal discharge'' and ''on examining the cervix, the os or opening to the uterus, it was found to be soft or open, with a sanguineous purulent discharge. There was also erosion around the os or the opening to the uterus. The uterus was enlarged and excruciatingly tender. There were no masses, abnormal masses palpated within the pelvis. Q. From your history of the case, Doctor, and from your examinations, were you able to arrive at an opinion as to what had caused this? A. Yes, we made a diagnosis of a criminal abortion.'' Counsel for defendant immediately moved to strike the word ''criminal''; the prosecution agreed that ''criminal abortion'' be stricken. But the defense attorney immediately said: ''And I think that may, I cite it as prejudicial procedure and move for a mistrial.'' And the court: ''Well, the reference in the answer, ladies and gentlemen, to the criminal abortion will be stricken from the record, and you are instructed to disregard such reference. The motion will be denied. MR. GALLIANO: May I ask a question? Does that mean that criminal abortion, the both words will be stricken? THE COURT: Yes. That is correct.'' Then followed this: Q. Please do not use that expression, Doctor, in your answer. Did you find that there had been an abortion on this woman? A. Based upon the patient's history and the findings from the physical examination, that was the only conclusion we could make. ... Q. From your examination of this woman, from the records, history of the case, was this a spontaneous abortion? A. Well, spontaneous abortions usually do not become infected. This patient was infected, therefore, we had to draw a conclusion that this was not a spontaneous abortion.'' It is to be presumed that the court's admonition to disregard the objectionable phrase was followed by the jury and any prejudice thus obviated. (See, *People* v. *Sweeney*, 55 Cal.2d 27, 46 [9 Cal.Rptr. 793, 357 P.2d 1049]; Fricke on California Criminal Procedure (5th ed.) p. 464.) Of course, the district attorney's use of the phrase ''criminal abor-

tion'' was but a part of his statement to the jury of what he expected to prove, and there was in fact no impropriety in it.

Appellant's other charges of misconduct on the part of the prosecutor have been examined in the light of the record and found to be without merit.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 20, 1963.