Filed 4/3/14  P. v. Weissman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARC WEISSMAN,<br><br>        Defendant and Appellant. | A136785<br><br>(San Mateo County<br>Super. Ct. No. SC073627A) |

## I.  INTRODUCTION

Defendant Marc Weissman, an attorney, entered a Chase Bank (Chase) branch in Foster City with a fraudulent check made out to his former law firm for $280,000 and, according to the bank teller and assistant manager, tried to cash it.  Defendant testified he was 99 percent sure the check was fraudulent, because of the circumstances under which it came to him, but he just wanted the bank's confirmation of his suspicion.  He was joking when he said he wanted to cash the check.  A jury evidently disbelieved him, because it convicted him of burglary (Pen. Code, §§ 459 & 460, subd. (b)) and check fraud (Pen. Code, § 476).  Defendant was granted probation on the condition, among others, that he perform 400 hours of community service.  In this court, defendant contends the evidence adduced at trial is insufficient to support his convictions.  We affirm.

## II. STATEMENT OF FACTS

### A. *The Testimony of Bank Personnel*

On Saturday, January 22, 2011, defendant walked into a Chase Bank branch in Foster City. No other customers were present. Wesam Deawah, a bank teller, noticed that defendant appeared to be waiting to speak to someone and asked if he could help. Defendant walked to Deawah's teller station, handed Deawah a Chase cashier's check for $280,000, and said he would like to cash the check. The cashier's check was for a "relatively high [amount] to cash" and it looked very different from a Chase cashier's check. Because it is unusual for someone to ask to cash such a large check, Deawah assumed he had misheard defendant, or defendant had misspoken, or defendant must be joking. So, Deawah asked defendant again what he would like to do with the check. Defendant repeated he wanted to cash the check. Deawah immediately began looking up the account number on the computer while simultaneously asking defendant for identification, per standard bank practice. Although the check was made out to "Weiss and Weissman, Inc.," the name on the check matched the name on defendant's identification. The account associated with the cashier's check had many red flags for fraudulent activities. Deawah told defendant to wait while he presented the check to his assistant manager, Alpana Sinha. While Sinha was looking up the account, Deawah went back to defendant and asked if there was a letter with the check. Defendant said yes and handed over a letter to Deawah, which Deawah took with him when he went to talk to his manager.

Sinha confirmed the fraudulent activity on the account and called Chase's fraud department. The bank employees were instructed to confiscate the check and any other evidence that came with it, and to notify the customer it is a fraudulent check that the bank is unable to process.

Deawah followed these instructions and told defendant, "[T]his is a fraudulent check and we are unable to cash it or process it." He also said the bank had to confiscate

2

it and thanked defendant for bringing the fraudulent check to the bank's attention. Defendant replied he still wanted to cash the check. He stated it was his check and his name was on it; it was his property and he wanted to keep it. Deawah said the check belonged to Chase and they had to report it. When defendant asked to take a closer look at the check, Deawah held it up at a distance. Defendant reached over the counter and tried to take the check from the teller's hand. After a tug-of-war, the teller took the check back from defendant, who then said he was going to call the authorities. Defendant stormed out of the bank but returned a few minutes later and asked the teller to call the authorities for him.

Defendant never indicated to Deawah that he was joking. He never said anything along the lines of, "You probably can't cash this check." He never asked the teller to verify whether the check was fraudulent. Based on what he said and the way he acted, it seemed to Deawah that defendant was representing that the check was genuine.

After completing her duties with respect to the fraudulent check, Sinha went to Deawah's teller station to lend him her support. Sinha never saw the letter; she heard a conversation about it between the teller and defendant. She also heard defendant say he wanted to cash the check "again and again." She saw defendant grab for the check. He did not appear to be joking. Neither she nor the teller told defendant the check was fraudulent as far as she was aware. She thought defendant might have exited the bank as the police entered, but she was not sure. She saw Officer Blankswade, but bank policy prevented her from giving the check to the officer at that time.

## B. *The Police Investigation*

Defendant was waiting outside the bank when Foster City Police Officer Rosemerry Blankswade arrived. To Blankswade, defendant appeared "flustered." He was pacing in front of the bank with his arms firmly crossed on his chest and his eyes darting about very quickly. As soon as she was within earshot, defendant told her

spontaneously that the check was his and he wanted it back. He said he knew the check was fraudulent before he went to the bank, but he wanted to know for sure.

Defendant explained to Blankswade that on January 4, 2011, he received an email from a woman named Karen Clark informing him that her ex-husband, one David Barker, would be sending him a check for $290,000 "for partial payment." Defendant said he did not know either Clark or Barker; they were not clients, friends, or colleagues. The email was directed to him personally and not to his former law firm. Defendant said he knew it was a scam because he did not do divorce work and had never done any work for these people.

On the morning of Saturday, January 22, defendant received a package containing a check for $280,000 and a letter naming two other people he did not know. At this point, defendant knew "for a fact" the check was fraudulent. Nevertheless, he called Chase Bank in an unsuccessful attempt to verify whether or not the check was fraudulent. The bank's phone representative suggested he show the check to someone at a branch. When defendant got to the bank, he asked the teller if he could cash the check. Defendant told Blankswade he "wanted to verify whether or not that check was real by cashing it."

Defendant never told Blankswade he was joking when he said he wanted to cash the check. Blankswade testified defendant said "[h]is intention was to cash [the check]." His exact words were: "I wanted to cash the check." That admission was not memorialized in the police report. Neither was the fact that Blankswade interviewed the assistant manager.

Later, defendant forwarded to Blankswade the January 4 email. Blankswade memorialized the email verbatim in her police report. It said: "Dear Marc Weissman. Good day to you. Work has been highly demanding over here lately. This is to inform you that my ex-husband, David Barker, has just confirmed to me that he has made a partial payment of $290,000 in your firm's name. He said his job currently took him to

4

Canada and certified funds was [*sic*] mailed from there. He also opines that funds will get to you today. Do confirm to me upon receipt of the funds. Please note that as soon as you receive the funds you are to deduct all of your charging fees and have the balance sent to me. Once again, thank you so much for making this happen. Awaiting your response, Karen Clark." The forwarded email included defendant's response: "Were you expecting only partial payment? Then I have good news. He paid it in full. Where do you want me to mail it to you?"

Blankswade obtained the letter that accompanied the check from the bank teller. The letter contained the names Winnie Bardot and David Achibang, as well as an email address and phone number. Although defendant sent "quite a few emails" to Officer Blankswade and Captain Froomin requesting the charges against him be dropped, he never asked them to investigate these two persons.

Chase Bank failed to provide the video surveillance for that day in response to a subpoena from the district attorney's office. However, some snapshots from the bank's digital video system were produced at trial.

## C. *The Defense*

Defendant testified on his own behalf. He is an attorney specializing in the practice of tax and estate law since 1980. He started a law firm in San Francisco, Weiss & Weissman, which he left in 1996 to practice out of his home. Although he maintains an association with his former firm, he has no ownership interest in it.

His law practice has been lucrative, earning him an average income of $245,000 per year from 2007 to 2011. He and his wife own three rental properties that generate a positive cash flow of more than $51,000 per year. They have $400,000 of equity in their Foster City home, and retirement accounts worth $866,000. Despite this wealth, they live frugally and drive old cars. A member of Peninsula Sinai Congregation, a Jewish

temple,[1] defendant observes the Sabbath and does not like to be seen driving or working from sundown on Friday to sundown on Saturday; however, he picks and chooses which religious rules he follows.

It was not his intention to walk out of the bank with $280,000 in cash.

He immediately recognized from the original email that it was a scam. He responded to the email because he was bored and he thought, "[W]ouldn't it be nice to turn a scam on a scammer." The check looked real to him, although he was "99 percent sure it was phony." However, he was not going to "just throw it out," because it looked real and he did not "need the aggravation of the person who sent it to me asking where is the check, what happened to my money." Besides, the people who sent the check were potential clients.

Defendant has had clients who sent him large amounts of money to be held in his trust account, including one client who sent him money to make monthly alimony payments to the client's ex-wife.

He went to the bank intending to talk to a bank manager, but all the bank officers were with customers. When the teller asked if he could help, defendant said, "Sure, I would like to cash this check." It was his "odd sense of humor." He never seriously expected to cash a $280,000 check. He also wisecracked something like: "They probably don't even have that much cash in the bank." Defendant did not think the teller took him seriously.

While waiting for the teller to come back, defendant was "mad as hell" because the bank was wasting his time instead of letting him verify the check's status on the phone, and because he was "out on Sabbath in public doing business, which is not something a good Jew should be doing." Neither the teller nor the manager told him the check was fraudulent. They said they were going to keep the check.

---

[1] Captain Froomin is also a member of the congregation.

Defendant admitted that when it became apparent to him the teller was not going to return the check, he "tried to pull it out of [the teller's] hand." Initially, defendant said *he* was going to call the police: "This is my paperwork. They will get it back for me." In the end, the teller had to make the call because defendant did not have his cell phone with him.

Defendant agreed he told the officer: "That check is mine. It has my name on it. It was written to me and I want it back." He also said: "I knew it was fraudulent before I came over here, but I wanted to know for sure. So, I went into the bank to see for sure."

### III. DISCUSSION

Defendant argues the evidence adduced at trial is insufficient as a matter of law to support his convictions for burglary and check fraud, because the evidence did not establish he had the intent to defraud the bank. We disagree.

In reviewing a claim of insufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) "An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) "Evidence is sufficient to support a conviction only if it is substantial, that is, if it ' "reasonably inspires confidence" ' [citation], and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People v. Raley, supra,* 2 Cal.4th 870, 891.) An appellate court must "accept logical inferences that the jury might

7

have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on other grounds in *People v. Burton* (1961) 55 Cal.2d 328, 352.)

The jury here was instructed on Penal Code section 476: "To prove [that] the defendant is guilty of this crime, [the] People must prove that: One, the defendant attempted to pass or use a false check; Two, the defendant knew the document was false and; Three, when the defendant attempted to pass or use the document, he intended to defraud. Someone intends to defraud if he or she intends to deceive another person either to cause a loss of money or something else of value or to cause damage to a legal, financial or property right. It is not necessary that anyone actually be defrauded or actually suffer a financial, legal or property loss as a result of the defendant's acts. A person attempts to pass or use a document if he or she represents to someone . . . that the document is genuine. The representation may be made . . . by words or conduct and may be either direct or indirect." (CALCRIM No. 1935.)

The jury was also instructed, in relevant part, that to prove defendant guilty of burglary, "[the] People must prove that: One, defendant entered a building and; Two, when he entered the building he intended to commit check fraud, Penal Code section 476," as defined in the instruction on that crime.

Here, defendant's "arguments of insufficiency of the evidence are built mainly upon actual or asserted inconsistencies in the testimony of various witnesses." (*People v.*

8

*Reinard* (1963) 220 Cal.App.2d 720, 730.) For example, defendant focuses on differences between the testimony of the teller and the testimony of the assistant bank manager. He also points to discrepancies between Officer Blankswade's testimony and the police report. But defendant does not show the teller's testimony was inherently improbable, physically impossible, or demonstrably false. At most, defendant demonstrates the teller's testimony was contradicted by the assistant manager on tangential issues: (1) whether she or the teller told defendant the check was fraudulent, (2) whether defendant said he was going to sue Chase, and (3) whether the assistant manager saw the letter defendant gave to the teller. None of these statements bear directly on defendant's state of mind.

Similarly, defendant argues that Officer Blankswade testified defendant told her he wanted to cash the check, but she did not put that statement in her police report. Blankswade also testified she interviewed the assistant manager, but did not include that in her police report. She also put in her report that defendant told the teller he wanted to cash the check *once*, whereas the teller testified defendant made that statement "roughly about four times." To be sure, these inconsistencies bear on the credibility of the various witnesses. However, these inconsistencies were brought to the jury's attention by cross-examination and in closing arguments, and the jury made its credibility determinations. The asserted inconsistencies do not "surmount the hurdle of *People v. Huston*, [*supra*,] 21 Cal.2d 690, 693." (*People v. Reinard, supra*, 220 Cal.App.2d 720, 730.)

In his briefs and again at oral argument, counsel for defendant stressed that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson, supra*, 443 U.S. 307, 318) because no reasonable jury familiar with modern day facts and conditions could have found defendant actually believed he could cash a $280,000 check in light of undisputed testimony and common knowledge that a person cannot cash a $280,000 check at a bank where he or she does not have an account. Essentially, defendant argues that since "[t]here was no imaginable

9

way, as a *practical* matter " (i.e., it was a physical impossibility) for defendant to actually cash the check for $280,000, no rational jury could have concluded defendant, an attorney, believed he could get away with it. Defendant cites no authority for the assertion that the intent to defraud necessarily includes "a subsidiary element of *belief* in the possibility of obtaining a wrongful monetary benefit." (Italics added.) Subjective belief in the success of a criminal enterprise, however delusional, is not part of the intent element of any crime so far as we are aware. Defendant testified he did not intend to walk out of the bank with $280,000 in cash. He testified it was his "odd sense of humor" talking when he told the teller he wanted to cash the check. He testified he "believed it [was] so obvious to anybody in the world that it is totally ridiculous to expect the bank to cash the check that I am astounded this whole process started." However, in light of other evidence – his insistence on cashing the check even when told by the teller it was fraudulent, and his attempt to snatch back the check when told the bank would have to keep it – the jury evidently disbelieved defendant's testimony.

The People's case against defendant, if believed, was strong. It included numerous admissions by defendant and testimony from which a rational jury could infer defendant's intent. Defendant's own testimony corroborated much of the People's case. The jury simply did not believe defendant was "only joking." Applying the rules of appellate review articulated above, ample evidence supports the jury's finding that defendant acted with the intent to defraud when he presented a check for $280,000 to a bank teller for cashing. Defendant's convictions are supported by substantial evidence.

## IV.  DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P.J.

_____
Becton, J.*

_____

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11